United States Court of Appeals
Fifth Circuit

**F I L E D**

**May 12, 2005**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-30645

_____

ANTONIO BOSLEY,

Petitioner – Appellant,

versus

BURL CAIN, WARDEN, LOUISIANA STATE PENITENTIARY,

Respondent – Appellee.

_____

Appeal from the United States District Court
for the Western District of Louisiana

_____

Before WIENER, BARKSDALE and DENNIS, Circuit Judges.

PER CURIAM:

Petitioner-Appellant Antonio Bosley appeals the denial of his habeas corpus petition brought under 28 U.S.C. § 2254. We affirm.

## I.  FACTS AND PROCEEDINGS

Bosley was indicted by a Louisiana grand jury on a charge of aggravated rape of his minor stepdaughter, Tabitha Dotray. He was convicted in state court in 1995 and sentenced to life imprisonment; and he has exhausted all his state court remedies.

In May 1999, Bosley filed for habeas relief in federal district court, challenging the validity of his indictment. Following an evidentiary hearing, a magistrate judge recommended that Bosley's conviction be reversed, his indictment quashed, and

a writ of habeas corpus issued on the basis of racial discrimination in the selection of the grand jury foreperson. The district court adopted the report and recommendation, but we reversed that court on appeal, holding that Bosley had procedurally defaulted his claim by failing to file a pre-trial motion to quash his indictment.[1]

On remand, the district court again referred the matter to the magistrate judge for a determination whether Bosley could show cause and prejudice, or actual innocence, so as to overcome the procedural bar. The magistrate judge recommended denial of Bosley's habeas petition and dismissal with prejudice because he could not establish either cause or actual innocence. Bosley objected to the report and recommendation and filed a motion to supplement the record to include the affidavits of Tacoma Bosley and Zakeetricess Bosley; he also sought an evidentiary hearing. The district court granted the motion to expand the record and also granted the motion to hold an evidentiary hearing but only on the limited issue of actual innocence, yet again referring the matter to the magistrate judge. We briefly summarize the testimony adduced at this hearing.

**Tacoma Bosley**

Tacoma, Bosley's 21-year old niece, testified that although she knew the victim, Tabitha, as a small child, they were never

---

[1] <u>Bosley v. Cain</u>, 51 Fed. Appx. 483 (5th Cir. 2002).

-2-

close.  According to Tacoma, she was at the Members Club, a night club in Monroe, Louisiana, in February 2003, when she ran into her cousin, Tonya Holmes, and Tabitha.  Tacoma described an altercation that occurred in the Club's bathroom while Tabitha was in one of the stalls.  Tacoma told Tonya that she did not like Tabitha because of what she had done to Bosley, and asked Tonya why she was friends with Tabitha.  Overhearing the conversation, Tabitha purportedly blurted out from the stall that she was sorry and that her "mamma made her say that about Uncle Tony had raped her." Tacoma later phrased what Tabitha said slightly differently: "Well, I ain't got nothing against y'all.  I didn't mean to say that.  My mamma made me say that."

On cross-examination, Tacoma acknowledged that she did not personally fill out the affidavit; rather, Bosley's attorney appeared at her house with the affidavit, proffered it to her, and she signed it.  Tacoma said that she had never spoken with the attorney before, surmising that Katy Banks, Tacoma's grandmother and Bosley's mother, had told the attorney about Tacoma's information.  On redirect, Tacoma stated that she had signed the affidavit because its contents were true.  It was elicited at the hearing that Tacoma was not then employed or in school, and had recently been convicted of theft.

**Zakeetricess "Kee Kee" Bosley**

Kee Kee, 15, is another of Bosley's nieces.  She too testified

she had known Tabitha as a child. Kee Kee described an incident at the apartment of her friend, Carvette, that occurred two years before the hearing. Carvette lived in the same apartment complex as Tabitha at the time, and Tabitha came to Carvette's apartment when Kee Kee was present to use the phone to call the police about a fight with her boyfriend. When Tabitha finished her call, Kee Kee asked her why she had caused Bosley to be put in jail, to which Tabitha responded that she did not know why and that "her mamma made her do it." Kee Kee testified that, until she revealed this to Bosley's counsel, she had never told anyone what Tabitha had told her. Kee Kee stated that she offered the information voluntarily after hearing the conversation between Tacoma and Bosley's counsel.

**Kendra Bosley**

Kendra, 16, yet another of Bosley's nieces, is Kee Kee's older sister and Tacoma's cousin. Kendra testified that two and a half years earlier, she was in WalMart with her older sister, that she separated from her sister and had gone to the clothing section where she encountered Tabitha. Kendra said to Tabitha, "I'm not trying to be messing or nothing. I just want to know why you lied on my uncle, why they spreading these rumors about he messing with her." She also asked Tabitha why she did not just tell the truth. Tabitha responded that she was scared and "she don't know what they'll do if she tell the truth." Kendra also testified she had

-4-

heard rumors in the community that Tabitha had lied, that her mother had put her up to it. The magistrate judge asked Kendra whether she had ever asked Tabitha if she had lied about Bosley, to which Kendra responded in the negative. It is not altogether clear from the transcript, but it appears that Kendra first volunteered this information to Bosley's attorney in the courtroom on the day of the hearing.

**Tabitha Dotray**

Tabitha, 20 years old and a certified nurse's assistant, testified that her mother never told her to lie or give false testimony. She admitted that the incident at Members Club occurred, but denied that she had discussed Bosley at that time. Tabitha said that Tacoma tried to "start something with her" in the bathroom, and had accused her of lying about Bosley. Tabitha denied that she had ever admitted to lying about what Bosley had done to her. Tabitha also acknowledged that she had gone to Carvette's residence to use the phone and that Kee Kee was present, but denied having any conversation about Bosley with Kee Kee. Tabitha also denied encountering Kendra at WalMart.

Tabitha testified further that she was employed at a nursing home and that she did not have any convictions. Bosley's counsel objected, stating that shoplifting charges were pending against Tabitha. She denied that any charges were pending against her when questioned by the court. The court requested that Tabitha look at

Bosley and state that her testimony was truthful, and Tabitha complied. She also stated that she was not acting out of fear of what might happen to her or her mother should she change her former testimony.

**Jacqueline Dotray**

Jacqueline, Tabitha's mother, denied counseling Tabitha to lie about the rape.

**Tonya Holmes**

Tonya, 21, is a friend of Tabitha's and a first cousin of Bosley. Tonya testified that when she entered the bathroom at Members Club in February 2003, she heard a lot of commotion; that Tacoma and two other girls were in the bathroom yelling. She stated that one of the girls was saying "she got my uncle locked up" and Tacoma was saying that she was going to "whup" Tabitha. Tonya also testified that she did not hear Tabitha say that she had lied or that her mother had put her up to it. Tonya denied telling Irma Parker that Tabitha had told her (Tonya) that she wanted to come clean and admit that she had lied at Bosley's trial. On questioning by the court, Tonya stated she was not aware of rumors in the community that Tabitha had lied at Bosley's trial.

**Irma Parker**

Irma, 33 years old and a certified nurse assistant, is Bosley's sister. She testified about an event that had occurred in her home two years earlier. While Tonya was working on Irma's

hair, Tonya told her that Tabitha had confessed that her mother had "put her up to it." Tonya then supposedly told Irma that Tabitha wanted to come over to Irma's house and confess; however, Tabitha never went to Irma's house. Although Irma stated that she had not had any further conversations with Tonya about Tabitha, she later testified, during direct examination, about a second incident that occurred on her uncle's porch, when Tonya had again told her and others there that Tabitha had said her "momma put her up to it." At this point in the hearing, it appears from the transcript that Ms. Parker became upset and angry and had to be calmed down. She then accused Tabitha's mother of sleeping with the assistant district attorney who had prosecuted Bosley.

On cross examination, Irma testified that the first incident with Tonya happened in 1998 or 1999, after which her mother contacted Bosley's lawyer, Ms. Hudsmith; that the incident on her uncle's porch occurred in 1999 or 2000, but that she could not recall who else was present on the porch with her. Irma had been convicted of forgery in 1993 or 1994.

Based on the evidentiary hearing, the magistrate judge issued a third Report and Recommendation, concluding that Bosley could not meet the actual innocence standard. The district court entered a judgment adverse to Bosley and consistent with the magistrate judge's recommendation, but subsequently withdrew that judgment to consider newly introduced evidence of Tabitha's criminal history. The new information revealed that Tabitha had recently been

prosecuted on shoplifting charges. The State introduced the criminal records of Tacoma, Kee Kee, and Kendra, each of whom had convictions. The magistrate judge issued a fourth Report and Recommendation, again concluding that Bosley had failed to establish actual innocence.[2]

The district court adopted this report and recommendation and again entered judgment against Bosley, but granted his application for issuance of a certificate of appealability. This appeal followed.

## II. ANALYSIS

The only issue before us is whether Bosley was able to meet the actual-innocence standard set forth in Schlup v. Delo.[3] In an appeal from the denial of habeas relief, we review a district court's findings of fact for clear error and its legal determinations de novo.[4]

We previously held that Bosley's habeas challenge to the

---

[2] An additional evidentiary hearing was held, but there was no transcript of the hearing provided on appeal. From what we can glean from the available documentation, the additional hearing concerned the allegation by Irma Parker that Jacqueline Dotray had been sleeping with the prosecutor at Bosley's trial. Testimony was given by Irma and her mother Katy Banks. In a supplemental report and recommendation, the magistrate judge indicated that he did not find the testimony credible, and again recommended finding against Bosley.

[3] 513 U.S. 298 (1995).

[4] Jeffers v. Chandler, 253 F.3d 827, 830 (5th Cir. 2001).

validity of his indictment is procedurally barred.[5]  "Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either 'cause' and actual 'prejudice,' . . . or that he is 'actually innocent.'"[6] Bosley has not appealed the district court's determination that he does not meet the cause and prejudice standard.  This leaves actual innocence as the sole issue of this appeal.

To establish actual innocence under <u>Schlup</u>, Bosley had to demonstrate that, "in light of all the evidence," "it is more likely than not that no reasonable juror would have convicted him."[7]  District courts are directed not to substitute their own judgments as to whether there is a reasonable doubt; the standard requires the district court to "make a probabilistic determination about what reasonable, properly instructed jurors would do."[8] Because our legal system has no means of defining innocence independently of the finding of reasonable doubt, "the analysis must incorporate the understanding that proof beyond a reasonable doubt marks the legal boundary between guilt and innocence."[9]  To

---

[5] <u>Bosley v. Cain</u>, 51 Fed. Appx. 483 (5th Cir. 2002).

[6] <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998) (citations omitted).

[7] <u>Schlup</u>, 513 U.S. at 327-28.

[8] <u>Id.</u> at 329.

[9] <u>Id.</u> at 328.

be credible, an actual innocence claim requires Bosley to "support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence — that was not presented at trial."[10]  A district court, in making its assessment of a petitioner's showing, is not bound by the rules of evidence that govern a trial:  "The habeas court must make its determination concerning the petitioner's innocence 'in light of all the evidence, including that alleged to have been illegally admitted . . . and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'"[11]

The evidence at Bosley's state trial was summarized by the magistrate judge in his third Report and Recommendation:

> The only real evidence of rape at trial was the testimony of the alleged victim, Tabitha Dotray, petitioner's stepdaughter, who was 13 years old at the time of the trial.  She testified at trial that when she was 10 and 11 years old, petitioner put his penis in her vagina and otherwise touched her in the "wrong places."  She testified that petitioner threatened to kill her if she told anyone.
>
> The only other meaningful evidence at the trial was the testimony of a medical doctor who had examined Tabitha and it was clear from his testimony that Tabitha had engaged at some point in full sexual intercourse.  In addition there was testimony from a clinical psychologist, who testified that Tabitha showed clinical symptoms of post-traumatic stress disorder which was

_____

[10] Id. at 324.

[11] Id. at 328.  The district court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial."  Id. at 332.

[sic] consistent with the trauma of being raped.

Importantly, the testimony showed that Tabitha made no complaints against Bosley prior to his moving into the family home in April 1993, even though she testified at trial that he had begun touching her . . . during that period of time. The Bosleys married in August of 1993. No complaints were made against Bosley during the marriage . . . . The testimony showed that Bosley lived continuously with Mrs. Bosley [Jacqueline Dotray] and the children, including Tabitha, until May 1994 when he left the family home [for another woman]. Thereafter, Bosley would occasionally return for brief periods of time, but by November 1994, when Tabitha was 12 years old, Bosley left for the last time.

It was not until February 1995 that Tabitha told her mother that petitioner had "bothered" her and she told her then only in response to being questioned by her mother regarding whether he had ever bothered her. The evidence also shows that when the mother, Jacqueline Dotray, had asked Tabitha on a previous occasion in November 1994 whether he had ever bothered her she had told her mother he had not.

The magistrate judge then proceeded to evaluate the new testimony from the evidentiary hearing. He first noted that Bosley's four witnesses (Tacoma, Kee Kee, Kendra and Irma) were all adamant and confident in their testimony. He also observed that Tabitha was unwavering in her denials of those witnesses' testimony. The magistrate judge found it significant that the four witnesses for Bosley were his relatives, that three of them related conversations that had occurred two or more years earlier, and that none had ever come forward with the information until the hearing. Nevertheless, the magistrate judge found that the new evidence proved that two of the reported encounters with Tabitha did occur — the one in the bathroom of the Members Club and the one at

Carvette's apartment — even though the substance of the encounters was in substantial dispute. He also found Kendra's testimony more credible than that of Bosley's other witnesses. The magistrate judge noted that Tabitha was gainfully employed and had never been convicted of a crime, in contrast to Tacoma who was unemployed and had been convicted of theft, and in contrast to Irma, who had been convicted of forgery.

In light of the new testimony, the magistrate judge stated that "the result could have been a change in the outcome of the trial," but that under the Schlup standard, it could not be said that it was more likely than not that this evidence would have changed the jury's verdict.

After subsequently receiving the criminal records of Tabitha, Tacoma, Kee Kee, Kendra, and Irma, the magistrate judge issued a fourth Report and Recommendation. Although Tabitha had lied at the hearing about not having a criminal record, the magistrate judge could not conclude that her lying about that under oath made her any less believable than the "new witnesses." Conversely, however, he could not conclude that the new witnesses were less believable than Tabitha. Although he remained convinced that very little evidence supported the jury's verdict to convict Bosley, the magistrate judge could not conclude that it was more likely than not that no reasonable juror would have found Bosley guilty beyond a reasonable doubt if the juror had heard the new evidence.

Bosley attacks the magistrate judge's conclusions on the

ground that he improperly applied a sufficiency of the evidence test instead of the less stringent test stated in Schlup. The Supreme Court in Schlup contrasted the test it adopted with the test for sufficiency of the evidence stated in Jackson v. Virginia:[12]

> The Jackson standard, which focuses on whether any rational juror could have convicted, looks to whether there is sufficient evidence which, if credited, could support the conviction. The Jackson standard thus differs in at least two important ways from the Carrier standard [adopted in Schlup]. First, under Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review. In contrast, under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments. Second, and more fundamentally, the focus of the inquiry is different under Jackson than under Carrier. Under Jackson, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion. Under Carrier, the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.
>
> Indeed, our adoption of the phrase "more likely than not" reflects this distinction. Under Jackson, the question whether the trier of fact has power to make a finding of guilt requires a binary response: Either the trier of fact has power as a matter of law or it does not. Under Carrier, in contrast, the habeas court must consider what reasonable triers of fact are likely to do. Under this probabilistic inquiry, it makes sense to have a probabilistic standard such as "more likely than not." Thus, though under Jackson the mere existence of sufficient evidence to convict would be determinative of petitioner's claim, that is not true under Carrier.[13]

Bosley's contention that the magistrate judge applied the more

---

[12] 443 U.S. 307 (1979).

[13] Schlup, 513 U.S. at 330.

exacting <u>Jackson</u> standard is incorrect.  The magistrate judge concluded that, even though in light of the new evidence, a juror <u>could</u> find Bosley not guilty, the magistrate judge could not conclude that it was <u>more likely than not</u> that no reasonable juror would find Bosley guilty.

Several points from <u>Schlup</u> guide us in concluding that the district court correctly held that Bosley had failed to meet the actual-innocence standard.  First, Bosley bears the burden of establishing that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence.[14] Second, there is no presumption of innocence at a habeas proceeding — Bosley "comes before the habeas court with a strong — and in the vast majority of the cases conclusive — presumption of guilt."[15]  Third, the <u>Schlup</u> standard "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty."[16]  Finally, we are not required to test the new evidence by a standard appropriate for deciding a motion for summary judgment.  "Instead, the court may consider how the timing of the submission and the likely credibility of the affiants bear

---

[14] <u>Id.</u> at 327.

[15] <u>Id.</u> at 326 n.42.  "[E]xperience has taught us that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare."  <u>Id.</u> at 324.

[16] <u>Id.</u> at 329.

-14-

on the probable reliability of that evidence."[17]

At best, Bosley's new evidence shows that a reasonable doubt could have been found to exist; it fails, however, to satisfy his burden of showing that no reasonable juror would have found him guilty. When we view all the evidence — both the new evidence and the evidence offered at trial — we are left with a classic swearing match. Bosley has not adduced any <u>reliable</u> new evidence, such as "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence."[18] In reviewing the testimony before him, the magistrate judge found the testimony to be in equipoise, i.e., he found all of the witnesses equally credible, or, more accurately, equally lacking in credibility. Bosley therefore failed to establish that it is more likely than not that no reasonable juror would choose to believe Tabitha's account over those accounts offered by Tacoma, Kee Kee, Kendra and Irma. As a result, we cannot conclude that it is more likely than not that no reasonable juror would have convicted Bosley.

### III. CONCLUSION

We affirm the judgment of the district court that rejects Bosley's claim of actual innocence and denies habeas relief. AFFIRMED.

---

[17] <u>Id.</u> at 332.

[18] <u>Id.</u> at 324.

-15-