*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0345p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

OYD COLLINS MCCRAY,

　　　　　　　*Petitioner - Appellee,*

　　　*v.*

DAVID VASBINDER,

　　　　　　　*Respondent - Appellant.*

No. 06-2381

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 03-73490—Arthur J. Tarnow, District Judge.

Argued: June 6, 2007

Decided and Filed: August 28, 2007

Before: NORRIS, GILMAN, and SUTTON, Circuit Judges.

---

## COUNSEL

**ARGUED:** Janet A. VanCleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. James R. Gerometta, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Janet A. VanCleve, OFFICE OF THE ATTORNEY GENERAL, Lansing, Michigan, for Appellant. James R. Gerometta, FEDERAL PUBLIC DEFENDERS OFFICE, Detroit, Michigan, for Appellee.

　　　　SUTTON, J., delivered the opinion of the court, in which NORRIS, and GILMAN, JJ., joined. GILMAN, J. (p. 10), delivered a separate concurring opinion.

---

## OPINION

---

　　　　SUTTON, Circuit Judge. A Michigan jury convicted Oyd McCray of first-degree murder and possession of a firearm during the commission of a felony, and the state court sentenced him to life in prison without the possibility of parole. Claiming to be innocent of the crimes, McCray filed an untimely application for a writ of habeas corpus, which the district court granted. Because McCray has not satisfied the gateway requirements for excusing a time-barred claim, *see Schlup v. Delo*, 513 U.S. 298, 327 (1995) (requiring the applicant to "show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt"); *Souter v. Jones*,

395 F.3d 577, 602 (6th Cir. 2005) (applying the *Schlup* standard to determine whether a late-filed claim should be equitably tolled under AEDPA), we reverse.

I.

On September 28, 1994, Perry Leonard was shot to death while sitting in his Chevrolet Suburban on Bessemore Street in Detroit. Three days after the shooting, a witness identified Oyd McCray in a line-up as the gunman. Detroit police arrested McCray and charged him with first-degree murder, *see* Mich. Comp. Laws § 750.316, and with possession of a firearm during the commission of a felony, *see id.* § 750.227b.

At McCray's trial, Eric Perrin, the witness who identified McCray, testified that he was driving on Bessemore Street sometime after 5:00 p.m. when he saw a brown Chevrolet Suburban truck stopped "in the middle of the street" blocking traffic. JA 88. He observed a man standing by the driver's side window of the vehicle talking to the driver. About ten minutes later, Perrin testified, a blue car pulled up to the Suburban. The driver exited the car, "put his arm across the roof . . . and looked toward the guy . . . in the Suburban. . . . And then when he did that, the [man standing by the driver's side window of the Suburban] started shooting the guy in the Suburban" through the open window, "just jerking the gun into the driver of the truck." JA 93–94. Perrin described the gun as a silver, semi-automatic handgun.

In the midst of the shooting, Perrin continued, the Suburban began moving, veered left, jumped the curb and crashed into a house, and all the while the shooter "kept firing the gun, running alongside the vehicle." JA 95. Perrin estimated that the shooter fired off "anywhere from five to ten shots." JA 102. He next saw the shooter enter the blue car, and, fearing that he had seen "more than what [he] should have," Perrin "got out of there." JA 98.

At a line-up three days later, Perrin fingered McCray as the shooter. At trial, Perrin admitted that he had not "noticed [McCray's] beard as profoundly at the time of the incident as [he] did in the line-up," JA 103, but concluded that McCray was in fact the person he saw shoot and kill Leonard.

The State's second witness, Dartrell Effinger, testified that he was the driver of the blue car that pulled up to the Suburban. He observed McCray, whom he had known for a "[l]ong time," JA 129, talking to Leonard, the driver of the Suburban. He got out of his car, greeted Leonard, then heard gunfire. He could not see McCray's hand because it was inside the driver's side window of the Suburban. After hearing gun shots, Effinger returned to his car and drove away. He denied that McCray and he left the scene together in his car and testified that he did not see Perrin's car stopped near the Suburban during the shooting. On cross-examination, Effinger acknowledged that he had told defense counsel that the shooter might have been McCray's brother, Stacy, who looked "very much" like McCray. JA 145–46.

A county medical examiner testified that Leonard died from "massive internal bleeding" caused by multiple gunshot wounds and noted that he found "15 bullet tracks" in Leonard's body. JA 154–55. The prosecution called several Detroit Police officers, who testified that Leonard was lying face-down in the Suburban with "blood spattered about the vehicle," JA 164, and that the vehicle had bullet holes in the passenger door. Police tested the Suburban for fingerprints but did not recover any.

McCray put on two witnesses, one of whom undermined his defense. Herbert Sanders, the attorney whom the court had appointed to ensure fairness at the suspect line-up, acknowledged that Perrin "was eventually able" to identify McCray as the shooter. JA 244. Evelyn Ross, who lived in the home struck by Leonard's Suburban, testified that she did not see Effinger's or Perrin's car at the time of the shooting.

The jury found McCray guilty on both charges. The court sentenced McCray to life in prison without the possibility of parole for the murder conviction and to two years in prison for the firearm conviction (to be served concurrently with the life term).

On direct appeal, McCray argued that his trial counsel had been ineffective because he had not contacted several potential witnesses. The Michigan Court of Appeals affirmed McCray's convictions, *see People v. McCray*, No. 181017, 1996 WL 33362436 (Mich. Ct. App. June 25, 1996) (per curiam); the Michigan Supreme Court denied leave to appeal, *see People v. McCray*, 564 N.W.2d 897 (Mich. 1997); and the United States Supreme Court denied McCray's certiorari petition, *see McCray v. Michigan*, 522 U.S. 888 (1997).

McCray collaterally attacked his convictions, filing a motion in the trial court for relief from judgment. Among the issues McCray raised was his trial attorney's failure to track down potential witnesses. The trial court denied the motion, *see People v. McCray*, No. 94-3272 (Mich. 3d Cir. Ct., Crim. Div. Feb. 9, 2000); and the Michigan appellate courts denied leave to appeal, *see People v. McCray*, No. 229804 (Mich. Ct. App. Apr. 26, 2001); *People v. McCray*, No. 119425 (Mich. Nov. 30, 2001).

McCray filed a second motion for relief from judgment, arguing that newly discovered evidence entitled him to a new trial. The new evidence consisted of two affidavits—one from Effinger expressing doubt that McCray was the shooter, the other from Jermaine Hunter claiming he had spoken to Effinger about the crime when the two were incarcerated together. Effinger, says Hunter, told him that McCray was not the shooter and that he had named McCray as the shooter to spare himself and his own brother jail time. The trial court denied McCray's motion. *See People v. McCray*, No. 94-3272 (Mich. 3d Cir. Ct., Crim. Div. Aug. 14, 2001). The Michigan Court of Appeals dismissed McCray's appeal as untimely, observing that, even if McCray had filed a timely appeal, it would have denied the motion because McCray "could have discovered the proffered evidence before he filed his initial motion for relief from judgment." *People v. McCray*, No. 243197 (Mich. Ct. App. Sept. 4, 2002). McCray did not seek leave to appeal to the Michigan Supreme Court.

McCray turned to federal court for relief in September 2003, filing a pro se habeas petition that raised three issues: (1) insufficient evidence to support the conviction, (2) a due-process violation when the trial court refused to allow Sanders to testify about what Perrin said during the line-up and (3) new evidence of McCray's innocence.

The State filed a motion for summary judgment, contending that McCray's claim was time-barred. McCray opposed the State's motion and, in support, attached affidavits from five individuals (including himself) supporting the argument that he did not murder Leonard. Following an evidentiary hearing, the district court denied the State's motion, concluding that McCray had "made a colorable showing of actual innocence." JA 906. The district court granted McCray an evidentiary hearing on his ineffective-assistance-of-counsel claim, after which it granted the writ.

## II.

The parties do not dispute the basics for resolving this appeal. The Antiterrorism and Effective Death Penalty Act (AEDPA) not only imposes stringent limits on our authority to second guess a state court's legal and factual determinations in a criminal case, *see* 28 U.S.C. § 2254(d)(1), (d)(2); *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), but it also imposes a one-year statute of limitations on bringing such claims, *see* 28 U.S.C. § 2244(d)(1). McCray did not satisfy this requirement when he filed his federal petition in September 2003, nearly five years after the Supreme Court declined to grant direct review of his case. *See* McCray Br. at 24. Under the

doctrine of equitable tolling, we have authority to excuse late-filed habeas claims in appropriate circumstances. *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005). One form of equitable tolling that we have recognized is a claim of "actual innocence." *See id.* at 602.

In determining whether an applicant has met the requirements for establishing a cognizable claim of actual innocence, we apply the same actual-innocence standard developed in *Schlup v. Delo*, 513 U.S. 298 (1995), for reviewing a federal habeas applicant's procedurally defaulted claim. *Souter*, 395 F.3d at 596. Under the *Schlup* standard, as adopted in *Souter*, the petitioner "must show that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327; *see id.* at 329 ("[T]he standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt."); *see also Souter*, 395 F.3d at 602. "[T]o be credible a gateway claim requires new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *House v. Bell*, 126 S. Ct. 2064, 2077 (2006) (internal quotation marks omitted). We must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.* (internal quotation marks omitted).

The parties do not dispute these legal principles; they just disagree about their application. The key question is whether McCray's new evidence, together with the evidence presented at trial, establishes "that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. In our view, it does not, and accordingly his habeas claim must be rejected as time-barred.

McCray relied on the following evidence in the district court in attempting to meet the standard. One, in an affidavit, McCray said that he "was not on Bessemore" Street when the shooting occurred and that he was "not clean shaven [on] the day of the crime," JA 26, or when he was arrested. During the evidentiary hearing, he also testified that he "was over at his sister's house baby-sitting" when the murder occurred. JA 1081. He also claimed that Effinger visited him in jail and told him that "it was Anthony Jones who shot Tommy" Leonard, but Effinger "said it was [McCray at trial] because he didn't want to be charged with accessory to murder for helping Tony get away." JA 26.

Two, in an affidavit, Stacy McCray (the petitioner's brother) said that he was shooting dice on Bessemore Street on the day of the murder. He saw "Tommy pull[] up in a truck," then saw a man named Tony go "over to the driver side of the truck." JA 27. Stacy McCray also observed a "guy named TRELL [Dartrell Effinger] pull[] his car on the side of the truck" and then "heard gun shots." *Id*. He ran for cover but came back out to watch "Tony run and get into the car with Trell." *Id*. He stated that he did not see his brother Oyd at the scene of the shooting. During the evidentiary hearing, Stacy McCray explained that "Tony" was Anthony Jones and that Jones also went by the name "F.T." JA 1059. He also testified that he ran into Perrin at Oyd McCray's trial and that Perrin told him that he might have mistaken him for his brother, Oyd.

Three, in an affidavit, Derrick Ross, who lived in the house hit by Leonard's Suburban, said that he was sitting in his house on Bessemore Street when he "heard a loud crash, something had hit [his] house" and when he "ran outside to see what it was," the suspect he "saw running from the truck was not . . . Oyd McCray." JA 28. When McCray subpoenaed Ross to testify at the evidentiary hearing, he did not show up.

Four, in an affidavit, Ferrie Rice (McCray's aunt) said that she heard gunshots while she was watching television in her house on Bessemore Street. After the shooting stopped, she "looked out

[her] front window and saw Anthony Jones running to Dartrell Effing[er]'s" car. JA 29. Rice stated that she "never saw [her] nephew Oyd McCray out there during any of this." JA 30. At the evidentiary hearing, Rice testified that she saw a dark blue car "cruising" up and down Bessemore Street on the day of the shooting, JA 1051, but could not recall the statements in her affidavit about seeing someone running to Effinger's car, and instead testified that when she looked out her window after the shooting she saw "someone dressed in black . . . run across the field" near the crime scene. JA 1048–49.

Five, in an affidavit, Demarlo Gilbert (a fellow prisoner) recounted a conversation he had with McCray while the two men were in prison. According to Gilbert, McCray told him that he lived near Bessemore Street and Gilbert responded that "the last time [he] was over there [he] almost got shot by some guy they call 'F.T.'" JA 31. He explained that in February or March 1994, F.T., whose real name was Anthony Jones, "had shot this guy in the truck and one of the bullets almost hit" him. JA 31. Gilbert claimed that he "saw F.T. go over to the truck . . . and a guy named 'Trell' pulled on the side of the truck and that's when the shooting started." JA 31. He "ran to the side of the house" but "came out when the shooting stopped and [saw] F.T. get into [a] car with Trell" and drive away. JA 31. Gilbert testified to the same effect at the evidentiary hearing.

Six, Cynthia Bacon (McCray's sister) testified that she and her brother were sharing a car on the day of the shooting and that she drove that car to work. When she got home, her brother was at her house and he agreed to watch her children while she and her husband went to the store. While they were shopping, her husband's pager went off, alerting them that there had been an emergency. They returned to the house to find McCray standing in the doorway. Bacon said another sibling informed her "that there had been a shooting on Bessemore." JA 1071.

Seven, at the evidentiary hearing, Dartrell Effinger recanted his trial testimony identifying McCray as the shooter, claiming instead that McCray was not the person standing beside Leonard's truck at the time of the shooting, and that he "couldn't identify" the perpetrator. JA 1030. He claimed that police "threatened to charge [him with Leonard's murder] and revoke [his] probation" if he did not admit to police that McCray killed Leonard and sign a statement to that effect, JA 1027, 1031, and that the prosecutor told him to "[s]tick with the statement" at trial, JA 1032.

Eight, Jermaine Hunter (a fellow inmate of Effinger's) testified that while he and Effinger were incarcerated together, Effinger told him that he and Anthony Jones had pinned the murder on McCray to get Effinger's brother out of prison. On cross-examination Hunter acknowledged that Effinger might have shared this information with him because Hunter knew that Effinger had testified against McCray at trial and Effinger did not "want to be pegged as a rat" because "he had the image . . . [that] he hated rats." JA 1044.

While McCray presents the testimony of many individuals to support his claim of innocence, he has not presented sufficient evidence to satisfy the *Schlup* standard. The sheer quantity of this evidence, in short, is not matched by its quality.

Oyd McCray's affidavit and testimony that he was not on Bessemore Street at the time of the murder adds little in the way of quality to his actual-innocence claim. A reasonable juror surely could discount his own testimony in support of his own cause. *See Riggins v. Norris*, 238 F.3d 954, 955 (8th Cir. 2001) (noting that court is "certainly entitled to disbelieve [defendant's] self-serving testimony"); *Cuppett v. Duckworth*, 8 F.3d 1132, 1139 (7th Cir. 1993) ("[W]e have repeatedly held that self-serving statements by a defendant that his conviction was constitutionally infirm are insufficient to overcome the presumption of regularity accorded state convictions.").

A reasonable juror also could conclude that the testimony of three of the other witnesses—Stacy (his brother), Bacon (his sister), Rice (his aunt)—would not alter the verdict. Not only did they, as family members, have a personal stake in exonerating McCray, *see Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005), but they did not see the murder and have not provided a good explanation for why they took so long to come forward with evidence that their relation stands wrongly accused of murder. *See, e.g.*, JA 1056 (Rice admitting she "made no effort to contact [McCray's] lawyer" and "just waited for someone to contact" her); JA 1063–65 (Stacy McCray testifying that he tried unsuccessfully to contact his brother's attorney "[t]hree or four times," but that he never called the prosecutor and that when police came to question him he did not tell them he "thought [he] had seen the killer"); JA 1071–73 (Bacon testifying that she tried to talk to McCray's attorney but did not attempt to speak to police or prosecutors).

Most critically, of the eight "witnesses" presented in support of McCray's application, seven of them—McCray and his three relatives as well as Ross, Gilbert and Hunter—say that *they did not see the shooting*. All of them (save McCray) say only that they witnessed the aftermath of the shooting or heard about it from others. This deficiency makes it impossible for these witnesses to refute the only disinterested eyewitness testimony that the jury heard—the testimony of Perrin, who watched the crime unfold and who identified McCray as the murderer. The only challenge to Perrin's eyewitness account remains his impression that the perpetrator was clean-shaven, *see* JA 103, 112, an initial impression that did not preclude him from being confident at trial that McCray was the murderer, *see* JA 91, 103.

That leaves the only eyewitness testimony offered in support of this actual-innocence claim—Effinger's testimony at the evidentiary hearing. While Effinger said that McCray was the murderer at trial, he said he "couldn't identify" the perpetrator at the evidentiary hearing. JA 1030. Reasonable jurors no doubt could question the credibility of this about face from another inmate and rationally could discount his testimony as nothing more than an attempt to keep from being "pegged as a rat" for having originally identified McCray as the gunman. JA 1044. *See United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001) ("[A]ffidavits by witnesses recanting their trial testimony are to be looked upon with extreme suspicion.") (internal quotation marks omitted); *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991) ("Recanting affidavits and witnesses are viewed with extreme suspicion.") *superseded in part on other grounds by* U.S.S.G. § 2D1.5(a).

In defending the district court's decision to apply equitable tolling to save his claims, McCray points to just one case—*Souter v. Jones*—in support of his actual-innocence claim. But McCray's evidence pales in comparison to the compelling proof that Souter offered to show he was not the murderer. There, a jury convicted the petitioner of killing Kristy Ringler, who was found lying unconscious across a roadway with a five-inch cut on her forehead and another significant laceration on the right side of her head. 395 F.3d at 581. The doctor who performed the autopsy concluded that Ringler either had been murdered or fatally struck by a car. *Id.* At trial, the jury learned that, before Ringler died, she and Souter had attended a late-night party where Souter had been drinking Canadian Club Whiskey out of a pint-sized bottle; that Ringler and Souter had gone outside to engage in "amorous" behavior, *id.*; and that, according to Souter, Ringler "abruptly" had gotten up, announced that she was going home and started walking along the highway where a passing motorist later discovered her, *id.*

When Souter and the other partygoers found out what had happened, they walked to the road (about 900 feet from the party). *Id.* Along the way, Souter tossed his whiskey bottle to the side of the road. *Id.* Police recovered it the next day. Investigators detected a trace of type A- blood on the label of the bottle—the same blood type as Souter, Ringler and 43% of the general population. *Id.* at 582. Souter, it turns out, had cut his finger on a door handle earlier in the evening, which also might have explained the blood. *Id.*

During the investigation, authorities found glass particles on Ringler's jeans and in the bandages covering her wounds. Further analysis showed that the glass was inconsistent with glass used to make automobile headlights and differed in color from the whiskey-bottle glass. A forensic pathologist concluded that Ringler sustained her injuries as a result of being struck by a car. *Id.* The chief investigating officer, however, remained convinced that Ringler was murdered, an opinion that the county medical examiner also voiced four years later. The examiner issued a report concluding that Ringler's injuries "may well have been inflicted by the Canadian Club pint Whiskey bottle." *Id.* (internal quotation marks omitted).

When a new sheriff reopened the case some eight years later, investigators failed to discover any new evidence. Nevertheless, the medical examiner issued a "stronger" report, finding that a bottle was responsible for Ringler's injuries and that "it was virtually impossible" that a car's side mirror could have caused them. *Id.* (internal quotation marks omitted). Twelve years after Ringler's death, police arrested Souter and charged him with the crime. *Id.* at 583. At trial, the medical examiner opined that the whiskey bottle "had a very sharp edge" capable of "caus[ing] the cutting [he saw] in the photographs" of Ringler. *Id.* (internal quotation marks omitted). A jury found Souter guilty of second-degree murder.

Eleven years after his conviction, Souter brought a habeas petition, which a panel of this court deemed untimely but nonetheless considered on the merits after announcing that an actual-innocence exception to the habeas statute of limitations existed and that Souter's evidence satisfied this gateway standard for equitable tolling. *Id.* at 585. Among the new pieces of evidence that Souter offered were these: (1) an affidavit from the doctor who performed Ringler's autopsy in which he claimed that his "testimony as to the object causing [Ringler's] wound(s) would be speculative," *id.* at 584 (internal quotation marks omitted); (2) an affidavit from a doctor who testified as an expert witness in which he recanted his trial testimony about the bottle being the murder weapon, deeming it "unlikely" that the bottle caused Ringler's injuries, *id.* at 583 (internal quotation marks omitted); (3) an affidavit from a private investigator who interviewed the bottle manufacturer and a forensic technician who both concluded that the bottle had no sharp edges, *id.*; and (4) an affidavit from the police laboratory technician on the case who admitted the bottle did not have a sharp edge and that the blood found on the label was "of little evidentiary value" because 43% of Americans share the same blood type as Ringler and Souter, *id.* at 584.

Souter's circumstantial-evidence case presents a weak analogy to McCray's eyewitness-evidence case. Souter presented compelling proof that the bottle, the "only evidence which directly ties Souter to Ringler's death," could not have caused Ringler's injuries. *Id.* at 590. Aside from his own testimony, McCray's exculpatory evidence consists of testimony (or affidavits) from people who did not witness the shooting and a recantation from an eyewitness with a motive for dissembling. All of the new evidence in this case, moreover, does nothing to contradict the testimony of an eyewitness, Perrin, who had no reason for lying about the murder and who had a bird's-eye view of the shooting. While we do not doubt the unfortunate possibility lurking in many criminal cases of mistaken identification, that ever-present risk must be handled by the beyond-a-reasonable-doubt standard and the other procedural protections afforded criminal defendants, not by watering down the stringent *Schlup* standard.

McCray wisely does not attempt to support his claim with *House v. Bell*, the one case in which the Supreme Court has held that a petitioner satisfied the gateway standard for establishing actual innocence. *See* 126 S. Ct. at 2068. Paul House faced the death penalty for killing Carolyn Muncey, whose body was discovered in the underbrush along an embankment just up the road from her driveway in rural Tennessee. *Id.* Among the key pieces of evidence linking House to the crime were the jeans he wore on the night of the murder, which had "reddish brown stains" on them that an investigator "suspected were blood" stains. *Id.* at 2072 (internal quotation marks omitted). When law enforcement officials packed up the jeans to take them to the Federal Bureau of Investigation

for testing, they packed them with, among other things, blood samples from Muncey's autopsy. *Id.* At trial, an FBI agent testified that the blood on the jeans was type A (the blood type of House, Muncey and Muncey's husband), that it was "consistent" with Muncey's blood and "that it was impossible" that the blood was House's. *Id.* at 2072–73 (internal quotation marks omitted). Investigators also found semen on Muncey's nightgown and underwear that appeared to be consistent with House's. *Id.*

After failing to obtain relief in his state court appeals, House filed an untimely habeas petition in federal district court, arguing actual innocence. *Id.* at 2075. He presented evidence that directly attacked the State's case: DNA tests revealing that the semen on Muncey's clothing was her husband's, not House's, *id.* at 2079; proof that the blood found on his jeans ended up there when one of the vials of Muncey's blood from the autopsy spilled on them in transit to the FBI for testing, *id.* at 2079–80; and new evidence "from multiple sources" that Muncey's husband "regularly" abused her, *id.* at 2083, and that he had confessed to killing her, *id.* at 2084.

The Supreme Court found that "the central forensic proof connecting House to the crime—the blood and semen—has been called into question and House has put forward substantial evidence pointing to a different suspect." *Id.* at 2086. Based on this new evidence directly attacking the key elements of the prosecution's case, the Court concluded that House had satisfied the strict standard for asserting a procedurally defaulted constitutional claim. *Id.* at 2087.

Here, by contrast, McCray provides no scientific evidence linking anyone else to the crime, no confession by Anthony Jones that he was the gunman and no evidence casting sufficient doubt on Perrin's testimony so as to ensure that no reasonable juror would have convicted McCray of the crime. Nor does he cite any additional cases in which we (or any other federal appellate court) have granted actual-innocence relief on comparable facts—and our independent research does not reveal any either.

Before our decision in *Souter*, we repeatedly refused to decide whether an actual-innocence exception to AEDPA's one-year limitations period existed, noting that such a determination was unnecessary because the petitioners raising the issue had failed to make the requisite showing of actual innocence. *See, e.g.*, *Allen v. Yukins*, 366 F.3d 396, 406 (6th Cir. 2004); *Townsend v. Lafler*, 99 F. App'x 606, 609 (6th Cir. May 14, 2004); *Whalen v. Randle*, 37 F. App'x 113, 121 (6th Cir. Mar. 12, 2002); *Channels v. McLemore*, 34 F. App'x 153, 155 (6th Cir. Jan. 25, 2002); *Owens v. Stine*, 27 F. App'x 351, 354 (6th Cir. Oct. 2, 2001); *Saylor v. Mack*, 27 F. App'x 321, 323 (6th Cir. Sept. 17, 2001). At least one of these petitioners offered stronger evidence than McCray has presented here. *See, e.g.*, *Whalen*, 37 F. App'x at 116 (actual-innocence evidence included testimony by another participant in the robberies who claimed that petitioner was not his accomplice, an affidavit from a witness who said that the prosecutor took witnesses to see petitioner for later identification purposes and a supplemental police report that had never been turned over to the defense containing an interview with a friend of petitioner's who would have exonerated him and would have identified the villain as the same man that the participant in the robberies would have identified); *see also Knickerbocker v. Wolfenbarger*, 212 F. App'x 426, 432–34 (6th Cir. Jan. 5, 2007) (post-*Souter* case in which petitioner's evidence—including testimony from inmate claiming petitioner's co-defendant told him that petitioner was not responsible for killing the victim, petitioner's polygraph results and a letter from a doctor indicating that petitioner might have been physically unable to strangle the victim—proved insufficient to warrant equitable tolling based on actual innocence).

Equitable tolling for actual innocence remains an important, though "extraordinary," remedy, *Schlup*, 513 U.S. at 327 (internal quotation marks omitted), one that we refuse to provide in a less-than-extraordinary case like McCray's. This approach is not only consistent with our own cases but with those of our sister circuits. *See Albrecht v. Horn*, 485 F.3d 103, 125–26 (3d Cir. 2007) (holding

that the "substantial remainder of the Commonwealth's case has not been discredited and provides ample evidence of guilt" despite expert's opinion that fire could have been accidental and testimony from petitioner's son that seemed to contradict the prosecution's theory of the case); *Buckner v. Polk*, 453 F.3d 195, 199 (4th Cir. 2006) ("affidavits and testimony from jailhouse informants" claiming that petitioner's friend planned the robbery and shot the victim and eyewitness testimony that the friend seemed "agitated" and made comments after the murder insufficient to pass through actual-innocence gateway); *Moore-El v. Luebbers*, 446 F.3d 890, 902–03 (8th Cir. 2006) (testimony of possible eyewitness only "would have established conflicting testimony among purported eyewitnesses to the murder, a circumstance that already existed," and therefore was insufficient to satisfy actual-innocence standard); *Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005) (rejecting claim where new evidence consisted only of testimony from four relatives of the petitioner); *Gomez v. Jaimet*, 350 F.3d 673, 679–81 (7th Cir. 2003) (holding that petitioner's own statements and statements of petitioner's co-defendants were "insufficient to warrant applying the 'extremely rare' actual innocence exception"); *Johnson v. Norris*, 170 F.3d 816, 818–19 (8th Cir. 1999) (reversing grant of habeas relief, finding that "[m]uch of the evidence"—witness's memory loss and potentially conflicting testimony of witnesses—"is not new and reliable").

## III.

For these reasons, we reverse and remand the case for further proceedings.

─────────────────────────

**CONCURRENCE**

─────────────────────────

RONALD LEE GILMAN, Circuit Judge, concurring. I write separately simply to point out that, had McCray timely petitioned for habeas relief in a pre-AEDPA world, I would have been inclined to affirm the district court's grant of relief on the basis of McCray's substantive claim of ineffective assistance of counsel. A review of the record reveals a grave deficiency in lawyer preparation. McCray's counsel not only failed to interview or subpoena the three witnesses whose names were provided to him by McCray, he also ignored potential witnesses that actually contacted him in an attempt to assist in McCray's defense. I believe that these failures were more likely the result of inexcusable inattention or negligence rather than a "reasoned strategic judgment." *See Wiggins v. Smith*, 539 U.S. 510, 526 (2003).

The Michigan Court of Appeals, however, was apparently untroubled by defense counsel's inaction, concluding that "the failure to interview witnesses does not establish ineffective assistance of counsel absent a showing that the failure to interview resulted in the loss of valuable evidence which would substantially benefit the accused." *People v. McCray*, No. 181017, at *3 (Mich. Ct. App. June 25, 1996). Had the state presented a stronger case, including some physical evidence linking McCray to the crime, I would be inclined to agree with the state court's conclusion. But that is not the case here.

Unfortunately for McCray, even if we were able to reach the merits of his claim, the heightened deference required by AEDPA precludes us from granting habeas relief. Although I respectfully disagree with the conclusion of the Michigan Court of Appeals, AEDPA requires more than my independent judgment that the state court reached an erroneous conclusion. *See Dyer v. Bowlen*, 465 F.3d 280, 284 (6th Cir. 2006) (holding that this court may grant habeas relief under AEDPA only if the state court's application of clearly established federal law is unreasonable, not simply wrong) (citing *Williams v. Taylor*, 529 U.S. 362, 413 (2000)). I do believe that Michigan's application of federal law—in this case, *Strickland v. Washington*, 466 U.S. 668 (1984)—was wrong, but I cannot fairly say that it was unreasonable. For this reason, I reluctantly concur.