NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0677n.06

No. 07-4537

**FILED**

**Oct 09, 2009**

LEONARD GREEN, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

JAMES CHAVIS-TUCKER,　　　　　　　　　）
　　　　　　　　　　　　　　　　　　　　 ）
　　　　Petitioner,　　　　　　　　　　　 ）
　　　　　　　　　　　　　　　　　　　　 ）
v.　　　　　　　　　　　　　　　　　　　 ）　ON APPEAL FROM THE
　　　　　　　　　　　　　　　　　　　　 ）　UNITED STATES DISTRICT
STUART HUDSON, Warden　　　　　　　　 ）　COURT FOR THE SOUTHERN
　　　　　　　　　　　　　　　　　　　　 ）　DISTRICT OF OHIO
　　　　Respondent.　　　　　　　　　　 ）

Before:　　　KEITH, GIBBONS, and KETHLEDGE, Circuit Judges.

**DAMON J. KEITH, Circuit Judge.** Petitioner-Appellant James Chavis-Tucker ("Chavis-Tucker" or "defendant") appeals from the district court's denial of his petition for a writ of habeas corpus. Chavis-Tucker was convicted by an Ohio jury of aggravated murder with a firearm specification and sentenced to 23 years to life in prison. His conviction was affirmed on direct appeal. Chavis-Tucker also filed a series of unsuccessful state post-conviction motions, two of which contained various affidavits Chavis-Tucker alleged demonstrated his actual innocence. After these motions were denied in state court, Chavis-Tucker filed a habeas petition pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of Ohio, raising five grounds for relief. The district court dismissed the habeas petition as untimely and found that Chavis-Tucker failed to demonstrate actual innocence to justify equitable tolling of his untimely petition or review of his procedurally defaulted claims. Chavis-Tucker appealed, and the district court certified the issue before this Court: whether Chavis-Tucker established a gateway actual innocence claim so as

to justify equitable tolling of the statute of limitations governing his habeas petition or consideration of any of his underlying procedurally defaulted claims. For the following reasons, we affirm the district court's decision to dismiss Chavis-Tucker's untimely habeas petition and to deny review of his procedurally defaulted claims for failure to demonstrate actual innocence.

## I.

The Court of Appeals of Ohio set forth the facts of this case:[1]

> In the late evening of April 10 or the early morning of April 11, 1992, Darrell Strickland was on the dance floor of Club Alexander's when defendant elbowed him; Strickland . . . asked defendant if he had a problem. Defendant responded by spitting at Strickland, and Strickland spit back at defendant. Defendant then hit Strickland and a fight ensued. Strickland testified defendant appeared to be intoxicated at the time of the fight. . . . A number of security guards at Club Alexander's broke up the fight and escorted defendant and Strickland to the front of the nightclub. Defendant and Strickland started fighting again at the front of the bar, and the two had to be separated once more. At that time, a security guard took a picture of defendant . . . to alert any new employee who was not present that night that defendant was barred from returning to Club Alexander's.
>
> Several security guards, including Doyle Banks, escorted defendant out of Club Alexander's. As Banks watched defendant walk to his car, he not only saw defendant shove another customer out of his way, but also observed defendant become angry on seeing a sticker had been placed on his windshield. Noting defendant appeared to be intoxicated at the time, Banks watched defendant, and a woman who was with defendant, get into an automobile and leave the parking lot. Although Banks could not see at first who was driving, he noticed that as the two left the parking lot, the woman was driving.
>
> After defendant had departed, several security guards, including Ernest Penn, escorted Strickland out of the nightclub. Penn stopped for a short time to talk to a woman he appeared to know. Strickland asked Penn if he knew where defendant was, and Penn replied that he did not. Penn then stated rather quickly, "[t]here he is, get down." . . . Penn pushed Strickland down. Strickland heard two gunshots. He then saw an automobile as it was "screeching off." . . . Strickland was under the

---

[1]This Court presumes the state court's factual findings are correct unless Chavis-Tucker rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

impression the shots came from the car, since "no other person came forward with a gun and no one was running from the scene with a gun."

Steve Alexander, a security supervisor at Club Alexander's, testified he witnessed the fight between defendant and Strickland on the night in question. . . . After Penn and two other security guards escorted Strickland out of the nightclub, Alexander's supervisor, William Fowlkes, sent him out to tell the guards to come back inside . . . . Once outside, Alexander noticed a car had pulled up; it had orange parking stickers on the windshield. Alexander was familiar with the stickers, since he had placed such stickers on several cars that night to tell the drivers they had parked improperly . . . . One of the cars on which he had placed a parking sticker was a Dodge Dynasty, license tag number BOW 865.

\*\*\*

Penn died as a result of a gunshot wound to his right eye. A .380 caliber bullet was later recovered from his body. A Dodge Dynasty, with a license tag number BOW 865 was found on or near a motel parking lot two or three days after the incident. Inside the car, the police found (1) a utility payment envelope with a return address to "Marie Chavis," (2) a temporary permit and driver's license application for "Jay Tucker," (3) a box of .380 caliber automatic ammunition, with the lettering "R-P" and "380 auto" on it, (4) two gold or bronze .380 caliber shell casings, and (5) one spent .380 caliber round. Expert examination of the two shell casings and one spent round revealed the two shell casings matched a shell casing found near a blue Mercury automobile at the scene of the shooting, and the one spent round was fired from the same gun that fired the bullet recovered from Penn.

\*\*\*

Neither the spent bullet found inside the Dodge Dynasty which matched the bullet recovered from Penn, nor [a] bullet hole in the roof of the Dodge Dynasty, nor the bullet markings on the inside[2] compel a reasonable jury to conclude the fatal shot came from outside the Dodge Dynasty; the jury reasonably could have concluded that evidence arose from different occasions.

*State v. Chavis*, No. 96APA04-508, 1996 WL 737583, at \*3-5 (Ohio Ct. App. Dec. 26, 1996).

On February 23, 1995, Chavis-Tucker was indicted on one count of aggravated murder in violation of Ohio Rev. Code § 2903.01(A) with a firearm specification under Ohio Rev. Code §

---

[2]A bullet hole found in the roof of the Dodge Dynasty was flanged inward, showing the shot came from outside the car.

2941.141, and one count of having a weapon under disability in violation of Ohio Rev. Code § 2923.13 with a prior offense of violence specification under Ohio Rev. Code § 2941.143. The charges in the indictment arose from the drive-by shooting death of Ernest Penn ("Penn"). A jury convicted Chavis-Tucker of aggravated murder and the accompanying firearm specification. On March 11, 1996, Chavis-Tucker was sentenced to serve twenty (20) years to life for his aggravated murder conviction with three (3) additional years of actual incarceration for the firearm specification. The Ohio appellate court affirmed Chavis-Tucker's conviction and sentence for aggravated murder and the Ohio Supreme Court denied him leave to appeal.

On August 11, 1997, Chavis-Tucker filed an application to reopen his direct appeal pursuant to Ohio Ct. App. R. 26(B). On November 6, 1997, the Ohio Court of Appeals denied Chavis-Tucker's application as untimely, finding that he failed to show good cause under App. R. 26(B) for his late application. Chavis-Tucker did not appeal this decision.

**A. Motion for Post-Conviction Relief**

On March 3, 1997, while his direct appeal was still pending, Chavis-Tucker filed a petition for post-conviction relief in State court pursuant to Ohio Rev. Code § 2953.21. Attached to his motion were affidavits from Christin Dion Wade, Tonee Andrews, Phyllis Leindsey, Terri Tucker, and Charmelle Macklin.

*1.     Christin Dion Wade, Tonee Andrews, Phyllis Leindsey, Terri Tucker, and Charmelle Macklin*

Christin Dion Wade ("Dion Wade") states in his affidavit, dated February 24, 1997, that he was in the parking lot of Club Alexander's on April 11, 1992 around 12:30 a.m., when he saw Doyle

Banks ("Banks") walk Chavis-Tucker and a woman, unknown to him, to a blue car and then off somewhere else in the parking lot. Chavis-Tucker then drove his car directly to the front of the club. As Chavis-Tucker proceeded to get out of his car, Dion Wade heard a man shout "hey," and turned to see Banks shooting at Chavis-Tucker. Chavis-Tucker immediately got back into the car and began shooting out of the driver's side back window at Banks. Banks jumped onto the hood of a car. As Banks continued to shoot in the direction of Chavis-Tucker, Dion Wade saw another security guard, who was coming out of the club, fall to the ground. After being told Chavis-Tucker was on trial for the murder of the security guard, Dion Wade went to the courthouse during Chavis-Tucker's trial and told defense counsel that he had seen this incident and would testify "that James Tucker did not shoot the security guard who was killed that night . . . ." Defense counsel neither called Dion Wade as a witness, nor interviewed him any further.

Tonee Andrews ("Andrews") signed an affidavit, dated February 24, 1997, in which she states that at the time of the murder, she was Dion Wade's girlfriend and was waiting for him in the parking lot of Club Alexander's. While she was waiting, she saw a blue car pull up to the front of the club, stop and park. As the man in the car began to exit his vehicle, Andrews heard gunshots and saw the man in the blue car re-enter the vehicle and begin to shoot out of his driver's side window at another man in the parking lot. The man in the parking lot climbed onto the hood of a parked car and continued to shoot. The man in the blue car drove away, while the other man chased after the car and continued to shoot. After hearing that Chavis-Tucker was on trial for the murder of the security guard, affiant states that she went to the courthouse and told Chavis-Tucker's counsel that

she was willing to testify that there was more than one person shooting the night of the murder. She alleges that defense counsel did not call her as a witness nor interview her any further.

Terri Tucker, Chavis-Tucker's wife, signed an affidavit, dated February 24, 1997, stating that she was in the courtroom on February 26, 1996 and heard Dion Wade and Andrews tell Chavis-Tucker's attorney that they were at the club the night of the murder and would testify that Chavis-Tucker did not kill Penn and that the murderer was the other man shooting in the parking lot that night. Charmelle Macklin ("Macklin"), Chavis-Tucker's mother, submitted an affidavit, dated February 24, 1997, alleging the same.

Phyllis Leindsey ("Leindsey") states in her affidavit, dated February 25, 1997, that she was in her car, which was facing the main parking lot of Club Alexander's, on April 11, 1992 at around 12:30 a.m., when she saw a car drive to the front of the club. She watched a man attempt to get out of the car, and then saw a man in the parking lot begin to shoot at the man in the car. The two exchanged fire. The man who shot first got onto the hood of a car and began shooting from the hood. At that point, Leindsey saw another man, who was standing by the front of the club, fall to the ground. The man in the parking lot continued to shoot as the car sped away.

*2.      Celeste Pankey, Karen Campbell, James Smith*

On July 5, 2000, Chavis-Tucker amended his petition for post-conviction relief to incorporate affidavits from Celeste[3] Pankey, Karen Campbell, and James Smith.

In Celeste Pankey's ("Pankey") affidavit, dated August 26, 1998, she attests that she left Club Alexander's around 12:30 a.m. on April 11, 1992 because of an altercation between Chavis-Tucker

---

[3]Pankey is referred to as both "Celeste" and "Celestine" throughout the record.

and another man. Banks was one of the security guards who escorted Chavis-Tucker outside. Because Chavis-Tucker was still upset, Celeste followed Banks and Chavis-Tucker to the car. By the time they reached the car, and Pankey and Chavis-Tucker got in, the man with whom Chavis-Tucker had the altercation walked out of the club. Chavis-Tucker noticed him, started the car, and drove to the front of the club. As Chavis-Tucker was stepping out of the car, Pankey heard someone shout "hey" from the parking lot, and saw Chavis-Tucker jump back into the car. At that point, Pankey heard gunshots, heard Chavis-Tucker say "thats [sic] the security guard shooting at us," and saw Banks shooting at them. Chavis-Tucker pulled his gun from the driver's side visor, and an exchange of gunfire ensued. Chavis-Tucker drove away with Banks still shooting at them.

Pankey states that she and Chavis-Tucker eventually realized they had a flat tire and had to stop to change it. At that point, Pankey noticed a bullet hole in the car, which she states was not there when she first entered the car back at the club. Chavis-Tucker then dropped Pankey off at home. When she entered her house, she was told by her cousin that the police had stopped by to question Pankey about the shooting at the club. Very soon after hearing this information, Banks and a man named Steve Alexander arrived at Pankey's home and threatened that both she and her son would be harmed, unless she implicated Chavis-Tucker in the murder and alleged that he was the only one shooting.

Pankey thereafter went to the police station, answered questions and gave a statement implicating Chavis-Tucker in the murder and stating that he was the only shooter that night. She states that she wanted to tell the truth that night but was afraid of the detectives' threats of being charged as an accessory to the murder. After Chavis-Tucker was arrested, the prosecutor sent

Pankey a tape of her statement and called her on the phone to go over her testimony. At that point, she told the prosecutor that her statement was not true. The prosecutor told her to come in and to continue to testify about what she said on the tape. She refused. She also attests that subsequent to the murder, her life and the lives of her children have been threatened on numerous occasions by Banks.

Karen Campbell ("Campbell") states in her affidavit, dated August 25, 1998, that she was leaving Club Alexander's sometime between midnight and 1 a.m. on April 11, 1992 when she saw Penn with three other men, two of whom appeared to be security guards. She only spoke to Penn for a minute because he was busy. As she was walking away, a blue car pulled up and a man stepped out of the driver's side. At that point, she heard someone yell and watched the man in the blue car look toward the parking lot where Banks was standing with a gun in his hand pointed toward the man in the blue car. Campbell immediately ducked behind a car. She saw Banks shoot and the man in the blue car jump back into his car. She saw the man in the blue car return fire and then drive off quickly, while Banks continued to shoot.

Campbell further states in her affidavit that she saw Penn lying on the ground bleeding, and that at this time, Banks admitted that he might have hit Penn when he was trying to hit Chavis-Tucker. Banks told Campbell he would take care of everything and that she needed to go home. Campbell was later afraid to testify in Chavis-Tucker's favor at trial because of the power and threat posed by the gang at Club Alexander's. She no longer feels afraid because most of the people in Alexander's gang have been arrested or are under investigation.

In James Smith's affidavit, dated July 29, 1999, he states that he spoke to Banks after the shooting on the night of the murder, and that Banks stated that he pulled out his gun to force Chavis-Tucker to leave the parking lot. Banks also stated that he saw Chavis-Tucker reach for something in his car that he thought was a gun. Banks, therefore, fired a warning shot, and Chavis-Tucker fired back. Banks admitted to knowing he hit the car but was unsure if he hit anyone in the car, and therefore, needed to get rid of his 380 gun, as a precaution.

3.      *Anthony Eskridge, Morinda Booth, and Steve Alexander*

On July 5, 2001, Chavis-Tucker filed additional affidavits in support of his post-conviction motion. These affidavits were from Anthony Eskridge, Morinda Booth, and Steve Alexander.

Anthony Eskridge's ("Eskridge") affidavit, dated June 12, 2001, indicates that he was at the bar on the night of the murder, and saw Banks escorting a man and a woman out of the club. When Eskridge approached Banks to greet him, the man being escorted pushed him. He later saw the man and the woman get into a car and pull around to the front of the club. Banks fired a warning shot when the man attempted to get out of his car. The two exchanged fire, and Banks kept shooting as the car drove off. Eskridge later noticed a "security guard laying on the ground shot in the face."

Morinda Booth's ("Booth") affidavit, dated June 25, 2001, states that she was outside smoking a cigarette on the night of the incident when she saw a blue car make a u-turn in front of the club. A man started to get out of the car when a security guard located in the middle of the parking lot shouted something at him and began to fire. The man jumped back into his car and returned fire. Another security guard was exiting the club, directly behind the man in the car, and fell to the ground.

In Steve Alexander's affidavit, dated October 18, 2000, he states that on the night of the murder, he put stickers on improperly parked vehicles in the parking lot. He placed a sticker on a blue Dodge Dynasty that had no bullet holes in the top or sides of the car, nor did the car have any flat tires.

\*\*\*

On January 6, 2005, Chavis-Tucker filed a motion for summary judgment on his petition for post-conviction relief. On August 15, 2005, the trial court dismissed Chavis-Tucker's petition for post-conviction relief on the merits and denied his summary judgment motion. Chavis-Tucker filed an appeal with the Ohio appellate court, which was denied for being untimely. On November 1, 2006, the Ohio Supreme Court denied Chavis-Tucker leave to appeal.

**B.     Motion for a New Trial**

On August 26, 1998, Chavis-Tucker sought a new trial, filing a motion pursuant to Ohio Crim. R. 33(A)(6) on the basis of newly-discovered evidence. The court held an evidentiary hearing on this motion on July 14, 2000, during which Chavis-Tucker asserted that the affidavit of James Smith, dated July 29, 1999, and the testimony of Pankey, Campbell and Mike J. Pocok[4] warranted a new trial.

Pankey testified in the hearing to the same facts detailed in her affidavit. She further conceded that as of the hearing, she had been acquainted with Chavis-Tucker for 15 years and friends with him for years. She also asserted that the man who shot at Chavis-Tucker was in uniform[5] and

---

[4]Very little testimony was elicited from Mike Pocock, who was put on the stand to testify that Club Alexander's was a front for narcotics distribution.

[5]Pankey mentioned that some of the security guards at Club Alexander's wore t-shirts and some wore uniforms and were armed.

that she later determined the man was Banks. She also specifically stated that Banks fired first, shooting six times toward Chavis-Tucker. Chavis-Tucker returned fire, dispensing three shots. Banks also continued to fire at them as they were driving off and blew out the front right tire of the Dodge Dynasty.

On cross-examination, Pankey admitted to being convicted in 1992 of receiving stolen property, convicted in 1993 of robbery, having twins by one of Chavis-Tucker's cousin's, lying to the police and putting an incorrect address on the affidavit she signed under oath in 1998.

Campbell also testified during the evidentiary hearing. She stated that on the night of the murder she was leaving Club Alexander's when she saw Penn escort a man out of the club. She spoke to Penn briefly. As she went on her way, a blue car pulled up, "close to the little bars around the entrance." She saw Banks, wearing a black uniform similar to a police officer's, shout at the man in the car while waving his gun. She also testified to seeing Banks raise and fire his gun before she ducked behind a car. While she was hiding, she saw Banks fire at the blue car, which was situated between Banks in the parking lot and the front of the club, as it was moving. She was unsure whether any shots were fired from the car. After the shooting was over, Banks approached Campbell, and she said: "I think you shot Ernest." In response, "he basically said I was trying to hit that guy in the car." She further stated:

> And, I'm like, okay, well, I think you shot Ernest. And he basically was like: Well, I'll take care of it. Don't worry about it. And I went to walk off to see what was going on, and he was like: No, go home. And because I know what they're like –
>
> Q. What do you mean what they're like?

A. As far as everybody that ran Alexander's, you know, I knew that – I don't know who the guy was, I think they used to call him Turtle or something, but he had all this money and he was basically known that if you, you know, cross him, he'd kill you. I mean, they were really known to be bad. And I just left.

Campbell further testified that she was afraid go to the police, and that she had a son and an elderly mom, both of whom she did not want to involve in this matter. She was not afraid to testify at the evidentiary hearing because "a lot of the people that were there or in that, I guess call it a ring, they are in jail or, I don't know, dead or just gone."

On September 19, 2000, Chavez-Tucker's motion for a new trial was denied for failure to demonstrate clear and convincing proof that a new trial was warranted. The court found that Pankey gave a videotaped statement to the police when originally questioned that was reviewed by defense counsel in preparation for trial, and therefore, she was available and discoverable at the time of trial. Additionally, the court found that while Campbell's testimony was relevant, it would not have changed the outcome of trial if it had been presented during trial. Finally, the court found the affidavit of Smith unhelpful, as it was limited to events following the shooting.

On October 19, 2000, Chavis-Tucker appealed this decision. His appeal was denied *sua sponte* on January 10, 2001 because he failed to file a brief within the time required by Ohio Ct. App. R. 18(C).

## C.       Petition for Writ of Habeas Corpus

On December 20, 2006, Chavis-Tucker filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In this petition, Chavis-Tucker alleged: (1) trial counsel rendered ineffective assistance; (2) the prosecutor committed misconduct during closing argument depriving

defendant of a fair trial; (3) the trial court erred by dismissing the petition for post-conviction relief without an evidentiary hearing; (4) the Ohio Court of Appeals violated Chavis-Tucker's due process right to full and fair appellate review by dismissing his petition for post-conviction relief as untimely; and (5) the Ohio Court of Appeals violated his due process rights by dismissing the petition for post-conviction relief on procedural grounds despite a showing of actual innocence. A magistrate judge recommended that this action be dismissed as barred by the one-year statute of limitations mandated by 28 U.S.C. § 2244(d). Over Chavis-Tucker's objections, the district court adopted and affirmed the magistrate judge's report and recommendation and dismissed the action.

Chavis-Tucker timely appealed. The district court granted in part, as to claims three, four and five, and denied in part, as to claims one and two, Chavis-Tucker's request for a certificate of appealability. It specifically certified the question at issue in the instant appeal: "Did petitioner establish a gateway actual innocence claim so as to justify equitable tolling of the statute of limitations or consideration of any of his underlying procedurally defaulted claims?"[6]

## II.

In reviewing a district court's legal conclusions in a habeas proceeding, this Court employs a *de novo* standard. *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008); *see also Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005). "[T]he application of equitable tolling is a question of federal law." *Kennan v. Bagley*, 400 F.3d 417, 420-21 (6th Cir. 2005); *see also McSwain v. Davis*, 287 F.

---

[6]A certificate of appealability only vests jurisdiction in the appellate court to consider issues specified in the certificate. 28 U.S.C. § 2253(c)(3); *see Bugh v. Mitchell*, 329 F.3d 496, 502 n.1 (6th Cir. 2003); *see also Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001) (limiting review of the dismissal of a habeas petition as time-barred to the particular claim certified for appealability). Both Chavis-Tucker and the Government raise issues not certified for appeal. Such issues are not properly before this Court and will not be addressed herein.

App'x 450, 459 (6th Cir. 2008) (noting that "[b]ecause equitable tolling based upon a claim of actual innocence involves the interpretation of the evidence as a whole and its likely effect on reasonable jurors, it is primarily a question of law on which we do not defer to the district court's judgment"). We review a district court's factual findings for clear error. *Souter*, 395 F.3d at 584.

Chavis-Tucker filed his habeas petition on December 20, 2006, after the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, became effective, which makes the requirements and standards set forth in AEDPA applicable to his petition. Under AEDPA, "[s]tate court factual findings are presumed correct unless rebutted by clear and convincing evidence." *Cornwell v. Bradshaw*, 559 F.3d 398, 405 (6th Cir. 2009); *see* 28 U.S.C. § 2254(e)(1).

## A.

This Court applies the *Schlup* standard to determine whether an applicant has met the requirements for establishing a cognizable claim of actual innocence. *McCray v. Vasbinder*, 499 F.3d 568, 571 (6th Cir. 2007) (referring to *Schlup v. Delo*, 513 U.S. 298 (1995)). Under *Schlup*, a habeas petitioner must "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," which can take the form of "exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Schlup*, 513 U.S. at 324, 327 (citations and internal quotation marks omitted); *see also House v. Bell*, 547 U.S. 518, 537-38 (2006) (discussing the *Schlup* standard); *Townsend v. Sain*, 372 U.S. 293, 317 (1963) (defining newly-discovered evidence as "evidence which could not reasonably have been presented to the state trier of facts"). *Schlup* "does not require absolute certainty about the

petitioner's guilt or innocence," but it "is [a] demanding [standard] and permits review only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). In reviewing such a claim, the district court "is not bound by the rules of admissibility that would govern at trial," and the habeas court may have to make some credibility assessments. *Schlup*, 513 U.S. at 324, 327, 330.

Here, Chavis-Tucker argues that he is able to demonstrate his actual innocence through the "three witnesses added by Petitioner" that "provide the answer to what the government could not answer at trial, namely how a bullet fired from the gun that killed the victim also ended up in Petitioner's car." It is unclear to which three witnesses Chavis-Tucker refers, given the numerous affidavits filed. In his appellate brief, Chavis-Tucker highlights the testimony of Pankey and Campbell and the affidavits submitted by Dion Wade, Andrews and Smith.[7] Regardless, even considering every affidavit presented in his original petition, Chavis-Tucker is unable to make a showing of actual innocence based on newly-discovered evidence. As the Government asserts, and the district court found, the alleged newly-discovered evidence is contradictory, was given by untrustworthy eyewitnesses and, in fact, is not newly-discovered.

1.      *The Affidavits of Terri Tucker and Charmelle Macklin*

First, a reasonable juror could easily conclude that the affidavits of Terri Tucker (Chavis-Tucker's wife) and Macklin (his mother) should be viewed with caution, since they are Chavis-Tucker's family members and, thus, have a personal stake in his exoneration. *McCray*, 499 F.3d at

---

[7]Chavis-Tucker also briefly mentions Phyllis Leindsey in the analysis section of his opening brief, stating that the "[t]he 1996 decision [by the Ohio Court of Appeals] did not include the affidavit of Phyllis Leindsey, who saw the guard shooting at the departing car."

574. Therefore, the testimony of Terri Tucker and Macklin is unlikely to convince a reasonable juror that more likely than not Chavis-Tucker is actually innocent of the murder of Penn. Additionally, since this testimony concerns conversations that took place during trial, and relate to defense counsel's alleged failure to call Dion Wade and Andrews, it was established during the trial and, thus, can hardly be considered newly-discovered evidence.

*2.     Celeste Pankey's Affidavit*

Second, a reasonable juror would not likely determine, based upon the recanting affidavit and oral testimony of Pankey, that Chavis-Tucker is actually innocent of the murder of Penn. A few hours after Penn's murder, Celeste made a videotaped statement to the police, in which she implicated Chavis-Tucker in the murder. She now advocates a contrary version of the facts. "Recanting affidavits and witnesses are viewed with extreme suspicion." *United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991). Additionally, "the skepticism with which a court examines such an affidavit only heightens when the recanting witness is a family member and the witness has feelings of guilt or the family members seek to influence the witness to change his story." *United States v. Willis*, 257 F.3d 636, 646 (6th Cir. 2001) (internal quotation marks omitted). At the evidentiary hearing for Chavis-Tucker's motion for a new trial, Pankey had known Chavis-Tucker for 15 years and was the mother of his cousin's twin children, providing a reasonable juror with a sound basis on which to discount her testimony.

Further, Chavis-Tucker was aware of Pankey at the time of trial, as she was with him on the night in question, and therefore, her testimony is not newly-discovered. Chavis-Tucker argues that Pankey was not available during trial because she refused to testify. He relies on evidence from

another case for support, stating that "when the owner of [Club Alexander's] made threats against the Assistant United States Attorney prosecuting him in a federal drug conspiracy, an executive protection detail was formed by the government." Therefore, Chavis-Tucker asserts "[i]t was not unreasonable for the witness to also take measures to protect herself," by not testifying at his trial. The threats highlighted by Chavis-Tucker were made by a man who was not implicated in this matter, except indirectly by his ownership of the club. Chavis-Tucker's argument, therefore, can be discarded by a reasonable juror as irrelevant. Moreover, Pankey's refusal to testify at Chavis-Tucker's trial could just as easily be interpreted by a reasonable juror as a refusal to provide testimony that would send her friend to jail, as it could be interpreted as a measure to protect herself and her family from the security guards at Club Alexander's.

Further, Pankey's credibility is damaged by her past history of dishonesty, demonstrated by her conviction in 1992 for receiving stolen property, her conviction in 1993 for robbery, her admission that she lied to the police, and the misleading address she included in her affidavit, to prevent others from finding her, which she signed under oath in 1998. A reasonable juror could conclude that Pankey is an unreliable eyewitness.

3.    *James Smith's Affidavit*

The affidavit of James Smith is a little more compelling than the aforementioned ones, as he is neither a recanting witness nor does he appear to be a family member of Chavis-Tucker's. The timing of his affidavit and his history, however, give one reason to question the veracity of his affidavit. *See Schlup*, 513 U.S. at 332 (stating that "the Court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence");

*see also Giles v. Wolfenbarger*, 239 F. App'x 145, 148 (6th Cir. 2007) (considering the authenticity of an affidavit, the motivation of the affiant, the circumstances of the affidavit's execution, the timing of its submission, and its consistency with other evidence in the trial record to be important in assessing whether a case is extraordinary and warrants tolling based on actual innocence). Smith was a drug dealer for the club and only filed this affidavit after he had been convicted of federal criminal charges and given a seven-year sentence.

Additionally, the probative value of Smith's testimony is diminished by his failure to actually witness the murder, relaying information only obtained after the murder. *See McCray*, 499 F.3d at 573-74 (discounting the testimony of witnesses that did not see the murder where disinterested eyewitness testimony was available). Further, Smith's affidavit suggests Banks wanted to dispose of his gun because he was afraid he hit someone in the car not because he was afraid that he hit Penn, even though Banks would have known at that point that Penn had been shot. If anything, this suggests Banks did not hit Penn. Given this inference, the timing of the affidavit, and Smith's failure to actually see the murder, Smith's affidavit does not compel us to find that more likely than not no reasonable juror could have found Chavis-Tucker guilty of the murder of Penn.

4. *Steve Alexander*'s *Affidavit*

The affidavit of Steve Alexander does not compel a finding of actual innocence because it does not provide additional information that was not available and was not presented to the jury at the time of trial. Steve Alexander testified at trial, as he did in his affidavit, that he placed stickers on inappropriately parked cars in the club parking lot, and that he placed a sticker on a blue Dodge Dynasty the night of the incident. Steve Alexander testified that he did not notice anything unusual

at the time he placed the sticker on the blue car, which a reasonable juror could conclude means that there were no bullet holes in the car or flat tires. Steve Alexander specifically attests in his affidavit to the fact that there were no bullet holes or flat tires. This evidence, which is not "newly-discovered," does not therefore support Chavis-Tucker's actual innocence claim.

5.      *Karen Campbell's Affidavit*

Campbell's testimony is relevant and was allegedly unavailable at the time of trial because she was afraid of Club Alexander's employees. The district court found that the timing of Campbell's affidavit diminishes her credibility. Yet if Campbell was afraid of Alexander's gang, it is reasonable that she would wait until the "ring" had been broken to testify. Nonetheless, based on the material inconsistencies in the evidence presented by Chavis-Tucker, as detailed below, we are unpersuaded that more likely than not no reasonable juror would have found Chavis-Tucker guilty of the murder of Penn.

6.      *Significant Contradictions*

Additionally, as the district judge found, there were material inconsistencies in these "newly-discovered" affidavits and with evidence presented at trial. The majority of these post-trial affidavits state that there was a second shooter (Banks), that a gun fight ensued ,and that because of the direction in which Banks was shooting, Banks shot Penn. This contradicts testimony elicited at trial from Strickland, who only heard two shots, and Steve Alexander, who heard three shots. William Fowlkes ("Fowlkes"), who was head of security at Club Alexander's in 1992 and present the night of the incident, testified during trial to hearing only one shot. Further, Eskridge, Leindsey, Dion Wade, and Andrews state that Banks shot at Chavis-Tucker from the hood of a car, while neither

Booth, Campbell nor Pankey, who was in the Dodge Dynasty at the time of the murder, mention that Banks climbed on top of a car. There is also some discrepancy in the testimony as to whether Banks kept shooting while the Dodge Dynasty was driving off. Many of the post-trial affidavits suggest that he did, while Strickland testified at trial that no one ran from the scene with a gun. Further, trial testimony placed Banks inside the club after escorting Chavis-Tucker to his car. Banks testified as much, as did Fowlkes, who also said that Banks escorted Strickland outside, which would have likely placed Banks in front of the club at the time of the murder.

Thus, while this evidence casts some doubt on the number of shooters at Club Alexander's on the night in question, the reason for the bullet holes in the Dodge Dynasty, as well as the reason that the same type of bullet used to kill Penn was found in Chavis-Tucker's car, we are not persuaded that more likely than not no reasonable juror could have found Chavis-Tucker guilty of Penn's murder beyond a reasonable doubt. *Souter*, 395 F.3d at 590. Ultimately, the number of contradictions and inconsistencies in these numerous affidavits compels us to find that Chavis-Tucker has not made a successful showing of actual innocence. *See McCray*, 499 F.3d at 573 (finding petitioner failed to support an actual innocence claim where the "sheer quantity of" evidence was unmatched by "its quality").

Further, it should not be forgotten that "evidence linked the bullet that killed Penn to the car that [Chavis-Tucker] was driving, and witnesses testified that [he] was angry and intoxicated and thus had a motive to begin shooting towards Strickland as Penn was escorting [Chavis-Tucker] out of the bar." The fact that the bullet hole in Chavis-Tucker's car was made using the same gun that fired the bullet that killed Penn suggests, at the very least, that Chavis-Tucker was at the scene of the

murder. Additionally, while affiants' statements that Banks was shooting from the hood of a car provide an explanation as to why a bullet hole was later found in the roof of the Dodge Dynasty, a reasonable juror could easily conclude that this bullet hole was made later in order to frustrate the evidence. In this case, the jurors at Chavis-Tucker's trial implicitly found this to be the case, given that Chavis-Tucker's attorney advanced the theory of an alternate shooter throughout his trial but the jury was ultimately unpersuaded. Further, the fact that defense counsel's strategy during trial was not just to implicate Banks in the murder, but also to suggest that the murderer may have been one of the other security guards, raises at least some doubt about the veracity and the confidence of the post-trial affidavits.

Finally, it is worth mentioning that the gateway actual innocence standard is not impossible to meet but that here, Chavis-Tucker's evidence does not reach the threshold level needed to successfully demonstrate actual innocence. In *House*, a gateway actual innocence claim was successful because the "central forensic proof connecting [the petitioner] to the crime . . . ha[d] been called into question, and [the petitioner] ha[d] put forward substantial evidence pointing to a different suspect." *House*, 547 U.S. at 554; *see also McSwain*, 287 F. App'x at 460. Even under those circumstances, the Supreme Court considered the issue "close." *House*, 547 U.S. at 554. The standard has also been met where a petitioner submitted new evidence that "the only direct evidence linking" him to the victim's death, could not likely cause the injury that proved fatal to the victim. *Souter*, 395 F.3d at 597; *see also McSwain*, 287 F. App'x at 460-61. The "newly-discovered" evidence submitted here does not create such a compelling picture of actual innocence, rather this evidence at most presents "a classic swearing match" between evidence produced at trial and post-

trial affidavits that lack any indicia of reliability. *Bosley v. Cain*, 409 F.3d 657, 665 (5th Cir. 2005). Therefore, it would violate the principle that the use of this exception "remain rare," and its corollary that its application is reserved for "only . . . the extraordinary case," to find that this case falls within the exception. *Souter*, 395 F.3d at 590 (citations and internal quotation marks omitted). We decline to make such a finding.

**B.**

We are also compelled to deny review of Chavis-Tucker's procedurally defaulted claims. Generally, a federal habeas court cannot review a claim that was procedurally defaulted in state court, *Jells v. Mitchell*, 538 F.3d 478, 488 (6th Cir. 2008), although a procedural default can be overcome by a show of cause and prejudice or "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 485, 496 (1986); *see also Hall v. Vasbinder*, 563 F.3d 222, 236 (6th Cir. 2009). This Court uses the same actual-innocence standard developed in *Schlup* to decide whether to review a federal habeas petitioner's procedurally defaulted claims. *McCray*, 499 F.3d at 571. Because Chavis-Tucker has not demonstrated actual innocence, he is not entitled to such review for his procedurally defaulted claims.

**III.**

Accordingly, for the reasons stated above, we affirm the district court's decision to dismiss Chavis-Tucker's untimely habeas petition and to deny review of his procedurally defaulted claims.