NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0309n.06

No. 18-2001

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| OYD MCCRAY, | ) | **FILED** |
| Petitioner - Appellant, | ) | Jul 17, 2024 |
| | ) | KELLY L. STEPHENS, Clerk |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| JEFF TANNER, Warden, | ) | |
| Respondent - Appellee. | ) | OPINION |

Before: SILER, MOORE, and KETHLEDGE, Circuit Judges.

KETHLEDGE, J., delivered the opinion of the court in which SILER, J., joined. MOORE, J. (pp. 24–32), delivered a separate dissenting opinion.

KETHLEDGE, Circuit Judge. Oyd McCray was convicted of murder in 1994 and sentenced to life imprisonment, largely on the strength of testimony from a disinterested witness who saw the shooting from a car's-length away. In 2003 McCray filed a habeas corpus petition, asserting an ineffective-assistance-of-counsel claim, among other claims. After several years of litigation, the district court held that McCray's petition was barred by the statute of limitations. To overcome that bar, McCray has since presented evidence—much of it from family members who claimed they were present at the murder scene (yet said nothing about the case for years), and some of it from fellow inmates—that McCray says demonstrates his innocence. We rejected McCray's claim to that effect some 17 years ago, but he now argues that another slate of putative witnesses—six of them, three of whom present only affidavits—would now compel every reasonable juror to find reasonable doubt as to his guilt. The district court rejected that argument, and we affirm.

I.

A.

At around 5:00 p.m. on the evening of February 28, 1994, Perry Leonard was sitting in his Chevrolet Suburban on Bessemore Street in Detroit. A short time later, a dark blue car pulled up next to Leonard's Suburban. At some point, a man walked up to Leonard's driver's side window and started talking to him. The driver of the blue car got out of his vehicle and, as he did, the man standing at Leonard's window pulled out a silver, semi-automatic pistol, thrust it into Leonard's vehicle, and began firing. Leonard's Suburban began to roll forward and, as it did so, the gunman kept shooting, eventually hitting Leonard 15 times. Leonard's vehicle ultimately jumped the curb and rolled into a nearby home. First responders rushed Leonard to the hospital, but he died on arrival.

Meanwhile, at the crime scene, Eric Perrin—who had been driving home from work—told investigating officers that he had been stopped directly behind Leonard's Suburban (indeed, it had blocked his way) when the shooting occurred. In his statement, Perrin described the shooter as a black male, "5'3"-5'7"" and "145-150" pounds, with dark skin, "armed with a silver automatic" handgun. Perrin said that, after the shooting stopped, the gunman walked toward a blue car that had pulled next to Leonard's Suburban. Perrin told police that he saw the blue car "back[] up toward Gratiot [Avenue]" after the shooting.

The day after the murder, police interviewed Leonard's girlfriend, Kathleen Parrish. According to the homicide file for the case, Parrish told police that Leonard had been "selling drugs" and that a guy named "'Bug' used to sell for him." She said that Bug "lived on Bessemore" and that Leonard would drive "over to his house and sit in front and Bug would come out." She described Bug as "black, 20's, 5-4, skinny, dark brown complexion, short hair, clean shaven" and

said that he drove "an older model yellow BMW." She said that some of Leonard's family members had told her that "Bug owed [Leonard] money." She also mentioned that Leonard had used the phone at her mother's house on the day of the murder. Parrish said her mother overheard Leonard "arguing with whoever he was talking to" and that he "mention[ed] the name 'Bug' while he was talking." Parrish did not provide police with Bug's real name.

On March 2, police received an "anonymous tip" that two men may have been involved in the shooting: Oyd McCray and Dante Effinger. Police soon arrested Dante and questioned him about the shooting. Dante purported to provide an alibi, but said that his grandmother had told him that Leonard had been killed. He also mentioned that he knew Leonard and that Leonard "hung around a guy called 'Bug'"—whose real name was Oyd McCray. Dante said that McCray lived on Bessemore Street. That same day, police arrested McCray.

The next day, police conducted a lineup with Perrin to see if he could identify the gunman. That lineup included McCray, Dante Effinger, and five others. At that time, McCray was 5'6", 165 pounds, and had facial hair; Dante was 5'11", 169 pounds. The court appointed an attorney, Herbert A. Sanders, to observe the lineup. According to Sanders's record of the lineup, Perrin said that McCray "could be" the gunman, but that he did not recall the shooter having facial hair. Perrin added that McCray "looks like him[,]" and Perrin eventually identified the gunman as McCray.

Later that day, police interviewed Dante's brother, Dartrell Effinger. (For clarity, we refer to Dante and Dartrell by their first names.) At that time, Dartrell was 6'1" tall and weighed 242 pounds. In a statement, he told police that, on the day of the murder, he had been driving his blue 1977 Chevrolet Malibu down Bessemore Street with a passenger named Anthony Jones when he pulled up on the curb near Leonard's Suburban—which was parked near McCray's house. He said that McCray—whose nickname was "Bug"—was standing at the "driver's window of [Leonard's]

3

truck talking to [Leonard]." Dartrell said that he and Jones got out of his car and were walking toward the middle of the street when they "started hearing shots." When Dartrell looked toward Leonard's Suburban, he "saw that Bug had his right hand in [Leonard's] window as the shots were going off." Dartrell said that he got back into his car and "backed up to the alley west of Gratiot." When police asked why he thought McCray shot Leonard, Dartrell responded: "I heard that Bug owed [Leonard] some money."

Police next interviewed Jones, whose statement was similar to Dartrell's. Jones said that, on the day of the murder, he had been "riding west on Bessemore with Dartrell Effinger in his blue Chevy Malibu." As they parked near Leonard's Suburban, he saw McCray standing at Leonard's window, talking to him. Jones exited Dartrell's car and heard Leonard tell McCray: "if I don't get the title to the BMW signed over to me by the end of the day I will kill you." Jones then walked across the street and shortly thereafter "heard some shots." He ran back to Dartrell's car and then saw that "Bug's hands was inside [Leonard's] window," "heard more shots," and heard McCray say, "I told you I was going to kill you." Jones also said he saw McCray "holding a silver handgun." After the shooting, Jones said he got back into Dartrell's car and they "drove off." When police asked what happened to McCray, Jones responded: "I don't know. I lost sight of him." Jones's statement also indicated that, at the time of the shooting, he was 5'8" and weighed 265 pounds.

McCray was soon charged with first-degree murder and with possessing a firearm during the commission of a felony. A few weeks later, on March 24, the state court held a preliminary examination hearing to determine whether there was probable cause to hold McCray on those offenses. Two witnesses, Jones and Perrin, testified.

Jones testified first and said that he had been standing on Bessemore Street "shooting dice" when Dartrell pulled up near Leonard's Suburban. The prosecutor questioned Jones about that testimony being inconsistent with his prior statement to police that, just before the shooting, he had arrived on Bessemore in Dartrell's car. Jones responded that he had been "forced [into] making" that statement. The prosecutor next asked Jones for the real name of the person nicknamed "Bug" that he had mentioned to police. Jones responded that "I didn't put no Bug in no statement" and said that he had never called anyone by that nickname. Jones then testified that he knew McCray, but that he had not seen him on Bessemore at the time of the murder. Jones added that, when the shooting started, he began running, jumped into Dartrell's car and left the scene, and that he did not see the shooter because he "wasn't looking around to see nobody." In response to several follow-up questions, Jones repeatedly denied having identified McCray as the shooter. He also denied having ever spoken to the police officer who purportedly took his prior statement until the day of the hearing.

Perrin, who had been sequestered during Jones's testimony, testified next. Perrin said that, on the day of the murder, he turned onto Bessemore Street on his way home from work, at which time he found the street "blocked" by a Suburban. He said he saw a "young man who was talking to the driver of the Suburban," and identified that person as McCray—who was sitting in the courtroom. Perrin testified that "a blue GM vehicle" with "only one person in it" soon pulled up near Leonard's Suburban, and that the driver got out of the car. Perrin said the driver "looked over at the young man in the Suburban," and that McCray then began to shoot Leonard. He testified that he heard "several shots"—"about four or five"—and that as Leonard's car began to veer off the road into a nearby home, McCray continued firing into the vehicle. Perrin said that, after the

shooting stopped, he noticed that the driver of the blue car had returned to his vehicle, and that McCray was walking back toward Perrin's car.

On cross-examination, McCray's attorney questioned Perrin whether he had "trouble identifying" McCray at the police lineup. Perrin acknowledged that he "didn't recall" McCray having facial hair at the time of the shooting. Perrin added that he "couldn't tell" if the shooter had facial hair, but that he was "sure" about what the shooter looked like, he "just didn't remember the beard."

Following that testimony, the court found "probable cause" that McCray had committed the charged offenses. Five months later, McCray's case proceeded to trial.

B.

On the first day of the trial, Perrin again testified that, on the day of the murder, he had been driving home from work when he turned onto Bessemore Street and found the road blocked by Leonard's Suburban. Perrin said he observed "one person who was standing . . . at the window of the brown Suburban." Perrin identified that person as McCray. Perrin said that, about ten minutes after he first pulled onto the street, "another car pulled up to my left ahead of me and straddled the Suburban." Perrin described what happened next:

> A guy got out of the car and . . . he put his arm across the roof of the car, and looked toward the guy, you know, in the Suburban. And I don't remember him saying anything, but he just looked as if he gestured, you know. And then when he did that, [McCray] started shooting the guy in the Suburban.

Perrin said that he saw McCray "just jerking the gun into the driver of the truck." He testified that Leonard's Suburban then "veered off to the left, jumped the curb," and went across "a vacant lot," and that McCray "kept firing the gun, running alongside the vehicle." He added that he "heard a lot of shots," anywhere "from five to eight shots, you know, maybe more. It was a whole lot of shots." Perrin said that Leonard's vehicle eventually crashed into a house, and, at that point,

6

McCray turned around and walked to the blue car parked nearby, and got into it. Perrin said that he only saw the driver and McCray in that blue car. Perrin said that, at that point, he felt he had seen "more than what [he] should have" so he just "got out of there."

The prosecutor then asked Perrin about the lineup. Perrin confirmed that he had identified McCray at the lineup:

> I said that was him. I also said that I just couldn't place his beard. His beard seemed to show in the light of the line-up; it was outstanding. I hadn't noticed his beard as profoundly at the time of . . . the shooting as I did in the line-up.

Perrin added that the lighting at the lineup was "very, very bright," but that, on the day of the shooting, "there wasn't a lot of sunlight out . . . it wasn't . . . a very sunny day."

On cross-examination, McCray's attorney asked whether Perrin recalled testifying at the preliminary examination that he heard only "four or five shots," rather than the "five to eight" or "several shots" he had mentioned at trial. Perrin admitted he might have previously testified differently as to the number of shots. McCray's counsel then asked Perrin about the lineup:

> Q: Also, when you went to the line-up in March, you said that you was not certain about the person who shot into the truck; is that correct?
>
> A: No.
>
> Q: You were not certain?
>
> A: No, I didn't say that. I didn't say I wasn't certain about him shooting in the truck. I saw him shoot into the truck.
>
> Q: But when you were at the line-up identifying the defendant, you were not certain as to whether or not it was the defendant; is that correct?
>
> A: No, I was certain it was the defendant; I just wasn't certain about his beard. I could see a very, you know, strong showing of his beard that I wasn't certain of at the time of the shooting.

McCray's counsel continued:

> Q: You did not say number three [at the lineup], the defendant, could be the shooter?
>
> A: I said that's him.

. . . .

Q: You did not say it could be him?

A: Well, I may have said that could be him, but I also said that was him because –

. . . .

Q: But you weren't sure, right?

A: I wasn't sure – I was sure about him; I wasn't sure about the beard.

Dartrell testified next. He began by telling the jury that he had known McCray for a "long time." He then said that, on the day of the shooting, he had driven his blue 1977 Chevrolet Malibu to Bessemore Street but—contrary to the statement he gave to police in which he said Jones had been riding with him at that time—said that he had been "riding by [himself]." He said he pulled next to Leonard's Suburban and saw McCray talking to Leonard. He also testified that he got out of his car, said hello to Leonard across the roof of his vehicle, and that was when the shooting started. He then reiterated that, as he said in his prior statement to police, he had seen "Bug" with his "right hand in [Leonard's] window as the shots were going off." He said that "Bug" was McCray's nickname. He then testified that, after the shooting began, he got back into his car. He added that, as he tried to pull away, he saw McCray standing in the middle of the street and that McCray did not leave the scene in his car. When the prosecutor asked why he thought McCray shot Leonard, Dartrell responded: "I heard on the streets that he owed him some money." The court struck that last statement as hearsay.

On cross-examination, McCray's counsel questioned Dartrell about his identification of McCray as the shooter:

Q: I asked you whether or not you were certain it was the defendant, and you told me it was not; is that correct?

A: Yes, that's correct.

Q: You told me you was not certain that you seen the defendant out there on that day.

8

A: Yes.

Q: Because you said the person you saw out there did not have a mustache; is that—

A: I think I recall saying that.

. . . .

Q: Okay. But on that day the defendant – you always know the defendant to have a mustache; is that correct?

A: Yes, a slight one, yes.

. . . .

Q: But the person you seen did not have a mustache?

A: I don't think so.

McCray's counsel also asked whether Dartrell could have confused the shooter for McCray's brother, Stacy. (For clarity, we will refer to McCray's relatives by their first names.) Dartrell responded that: "I mean I could tell the difference. They look . . . very much alike, very much alike." In response to follow-up questions, he added that he "may" have previously told McCray's counsel that "it may have been [Stacy] by the truck," but that he did not "recall" saying that. On redirect, the prosecution asked, "who was it outside of the driver's door of the brown Suburban on Bessemore street back on February 28th?" Dartrell responded, "Mr. McCray." On recross, McCray's attorney again asked Dartrell whether he was sure the shooter was McCray, but the court told Dartrell he could "step down," which ended that line of questioning.

Over the course of the next several witnesses, the prosecution established that, on the day of the shooting, police had arrived on Bessemore Street around 5:15 p.m.; that they discovered Leonard face down in his vehicle, covered in blood; and that Leonard died from injuries caused by 15 gunshot wounds. Officers also testified that their supervisor's original description of the shooter (presumably based on Perrin's statement to police) was that he was "a black male, 18 to

23, five-foot-seven, one hundred forty-five to one hundred sixty pounds, dark complexion, [and] clean-shaven[.]" The prosecution presented no physical evidence linking McCray to the murder.

The defense began its case by attempting to call into question Perrin's identification of McCray at the lineup. To do so, McCray's counsel called as a witness the attorney who had observed the lineup, Herbert Sanders. The defense asked Sanders whether Perrin had been able to identify McCray. Sanders responded: "Based on my notes, the witness was eventually able to make an identification of this individual."

The defense next called Evelyn Ross, who lived in the home struck by Leonard's Suburban. Ross said she had been inside her home when she heard Leonard's vehicle crash into it. She said she walked outside, but did not see any other cars on Bessemore Street at that time. The defense then rested.

The jury deliberated for just over an hour before convicting McCray of first-degree murder and possessing a firearm during the commission of a felony. The court sentenced McCray to life imprisonment without the possibility of parole on the first-degree murder charge, and two years' imprisonment on the firearms charge.

## C.

### 1.

McCray appealed his conviction, but the Michigan Court of Appeals affirmed. The Michigan Supreme Court denied leave to appeal, and the United States Supreme Court denied certiorari. *See People v. McCray*, No. 181017, 1996 WL 33362436, at *3 (Mich. Ct. App. June 25, 1996) (per curiam); *People v. McCray*, 564 N.W.2d 897 (Mich. 1997) (unpublished table decision); *McCray v. Michigan*, 522 U.S. 888 (1997) (mem.). In the trial court, McCray filed a motion for relief from judgment, claiming his attorney failed to track down potential witnesses.

The court denied the motion, and the Michigan appellate courts denied leave to appeal. *See People v. McCray*, No. 94-3272 (Mich. 3d Cir. Ct., Crim. Div. Feb. 9, 2000); *People v. McCray*, No. 229804 (Mich. Ct. App. Apr. 26, 2001); *People v. McCray*, No. 119425 (Mich. Nov. 30, 2001).

In January 2001, McCray obtained new evidence in the form of two affidavits. In the first, Dartrell said that, when he testified at trial, he had been unsure whether McCray was the gunman he saw on Bessemore Street on the day of the murder. He also asserted that the prosecutor told him that if he did not "stick" to his pre-trial statement identifying McCray as the killer, he would be charged with perjury. In the second affidavit, one of Dartrell's fellow inmates, Jermaine Hunter, said that Dartrell had told him that he and Jones had "put the murder on 'Bug'" so that Dartrell's brother, Dante, would not be charged with the crime. Based on that evidence, McCray filed a second motion for relief from judgment, which the trial court denied. *See People v. McCray*, No. 94-3272 (Mich. 3d Cir. Ct., Crim. Div. Aug. 14, 2001). The Michigan Court of Appeals dismissed McCray's appeal as untimely. *See People v. McCray*, No. 243197 (Mich. Ct. App. Sept. 4, 2002).

2.

In September 2003, McCray turned to federal court, filing a pro se habeas corpus petition raising (as relevant here) an ineffective-assistance-of-counsel claim. Specifically, McCray asserted that his trial counsel had failed to investigate and subpoena three witnesses who purportedly would have testified that McCray was not at the scene of the murder. The state moved to dismiss McCray's petition as untimely under the Anti-Terrorism and Effective Death Penalty Act's one-year statute of limitations. *See* 28 U.S.C. § 2244(d).

McCray conceded that his petition was untimely, but he argued that he could meet the actual-innocence standard announced in *Schlup v. Delo*, 513 U.S. 298 (1995). In support, McCray submitted the Dartrell and Hunter affidavits that he had filed in the state postconviction

proceedings, along with five new affidavits—from Demarlo Gilbert, Ferrie Rice, Derrick Ross, Stacy, and McCray himself. Based on those affidavits, the district court granted McCray an evidentiary hearing at which seven people—Gilbert, Dartrell, Hunter, Rice, Stacy, Cynthia Bacon, and McCray—testified.

Gilbert—a fellow inmate with McCray—asserted in his affidavit that, "back in February or March 1994," he had "almost got shot by some guy they call 'F.T.'" on Bessemore street. Gilbert said that he saw F.T. walk over to a truck, and that a guy named "Trell" then pulled up in his car next to the truck, which is "when the shooting started." He said he "saw F.T. commit the crime" and "get into [the] car with Trell" and that "F.T.'s real name is 'Anthony Jones.'" But at the evidentiary hearing, Gilbert testified that he did not "actually see the shooting," and that he identified F.T. as the gunman only because he heard other people saying that name, not because he recognized Jones.

Dartrell, for his part, recanted his trial testimony at the evidentiary hearing. He said that McCray was not the shooter; that he did not know who had killed Leonard; that police had threatened to charge him with Leonard's murder and to revoke his probation unless he signed a statement saying that McCray was the killer; and that, before the trial, the prosecutor told him to "stick with the statement"—which Dartrell said he perceived to mean that if he testified differently, he would be in trouble.

Hunter—who was serving time with Dartrell—testified that Dartrell had told him that Dartrell and Jones had pinned the murder on McCray to get Dartrell's brother, Dante, out of police custody. According to Hunter, Dartrell had also said that the prosecutor had threatened Dartrell with "some kind of charge" when Dartrell later tried to communicate that information to McCray's lawyer. On cross-examination, Hunter acknowledged that Dartrell might have shared this

12

information with him because Hunter knew that Dartrell had testified against McCray at trial—and that Dartrell did not "want to be pegged as a rat" because, in prison, Dartrell "had the image" that "he hated rats."

Rice—who was McCray's aunt—said in an affidavit that she was in her house on the day of the shooting, when she heard gunshots. She said that "when the shooting had ceased" she looked out her window and saw "Anthony Jones running to Dartrell Effinger's" car and get in. She added that she saw her nephew, Stacy, standing across the street. She also said that she did not see McCray "out there during any of this." At the evidentiary hearing, however, Rice did not recall seeing someone running to Dartrell's car, and instead testified that, when she had looked out her window after the shooting, she saw "someone dressed in black," a "slender guy," "run across the field" near the crime scene. She also admitted that she had never provided this information to the police or to McCray's lawyer.

Stacy—McCray's brother—said in an affidavit that, on the day of the murder, he saw a man named "Tony" standing next to Leonard's Suburban just before the shooting. He also said he heard gunshots, ran to the side of a nearby house, and saw "Tony run and get into the car with Trell." He said that his brother, McCray, "was not on Bessemore when this took place." During the evidentiary hearing, Stacy testified that "Tony" was Jones, and that Jones also went by the name "F.T." He also asserted that he had run into Perrin during McCray's 1994 trial, and that Perrin said that he might have mistaken him for his brother, McCray.

A third member of the McCray family—his sister, Bacon—testified that McCray had been babysitting her children at the time of the shooting. And Derrick Ross—who lived in the house on Bessemore Street struck by Leonard's car—said in an affidavit that, on the day of the shooting, he "heard a loud crash, something had hit my house." (We refer to Derrick by his first name to

13

distinguish him from his mother, who testified at trial.)  He said that when he ran outside, he saw a "black man, age 18 to 23, about 5'7", dark complexion, wearing a black hat and jacket running from" Leonard's vehicle.  He said that man was not McCray.  Derrick did not testify at the evidentiary hearing.

Finally, McCray himself said in an affidavit that he "was not on Bessemore" Street when the shooting occurred and that he was "not clean shaven on the day of the crime," or when he was arrested.  During the evidentiary hearing, he testified that he did not shoot Leonard and that he "was over at his sister's house baby-sitting" when the murder happened.  He also said that Dartrell had visited him in jail and told him that "it was Anthony Jones who shot" Leonard.

Based on those affidavits and testimony, the district court concluded that McCray had made "a colorable showing of actual innocence," and denied the state's motion to dismiss his habeas petition as untimely under 28 U.S.C. § 2244(d)(1).  The district court then granted McCray another evidentiary hearing, this time to hear testimony regarding his underlying ineffective-assistance-of-counsel claim.  During that hearing, as relevant here, McCray's cousin, Johnny, testified that he too had been on Bessemore Street during the shooting and had not seen McCray at the scene.

In September 2006, the district court conditionally granted McCray a writ of habeas corpus. We reversed, concluding that McCray had not satisfied the actual-innocence standard because the "sheer quantity" of McCray's evidence was "not matched by its quality." *McCray v. Vasbinder*, 499 F.3d 568, 573 (6th Cir. 2007).  We concluded that reasonable jurors "surely could discount" McCray's self-serving testimony; and that the same was true for the testimony of McCray's relatives, who had a "personal stake in exonerating" him.  *Id.*  Moreover, none of those relatives (according to the testimony at the hearing) had seen the shooting, and none had provided much explanation for waiting years to come forward with purportedly eyewitness testimony to exonerate

14

their family member. *Id.* We also noted that, of McCray's eight witnesses, seven of them—McCray and his three relatives as well as Ross, Gilbert, and Hunter—by their own testimony, had not witnessed the shooting. That left Dartrell's testimony, whose "about face" about the identity of the shooter at the evidentiary hearing we deemed questionable, especially in light of evidence that he had a motive to avoid being "pegged as a rat" in prison. *Id.* We therefore determined that McCray's family members and other witnesses had done little to undermine the trial testimony of Perrin—a disinterested, third-party witness who had seen the shooting at close range. We therefore held that McCray had not shown that "no reasonable juror would have found him guilty beyond a reasonable doubt." *Id.* at 571, 574 (alteration omitted).

3.

Yet a few months later McCray moved under Rule 60(b) for relief from the district court's judgment dismissing his habeas petition. (McCray at first sought from this court an order authorizing him to file his motion as a second or successive habeas petition, but we concluded such an order was unnecessary and remanded. *See In re McCray*, No. 08-1803 (6th Cir. Apr. 30, 2009) (Order).) McCray asserted that he had still more new evidence of his purported innocence, this time in the form of an affidavit from Dante Effinger (Dartrell's brother). Dante said that—during the police lineup—he had overheard Perrin say that McCray "could be the shooter but I am not sure." Dante also asserted that, afterward, Perrin approached him and said that "he wasn't sure if the guy he picked was the shooter," but that a police officer had "told him that it was."

The district court considered Dante's affidavit, but observed that Perrin was cross-examined on similar grounds at trial. Nor, the district court said, did Dante's affidavit undermine Dartrell's trial testimony that McCray was the killer. The court therefore denied McCray's Rule 60(b) motion.

McCray moved for reconsideration, attaching two more affidavits, one from Redrick Character (who was incarcerated with one of McCray's friends) and one from Demetrus Smith. Character claimed in his affidavit that he had been "reading cases" in prison and had come across McCray's. He further asserted that—on the day Leonard was shot—he had been on Bessemore Street "all day hustling and shooting dice"; that he "personally witnessed this shooting"; and that McCray "was not the shooter." Instead, Character said, a man named "Ant" had gotten out of "Trell's" blue car, shot Leonard, and then jumped back in "Trell's" car and fled the scene. He added that, "a day or so later," "Trell" told him that the shooting was a result of some "beef" between "Ant" and Leonard.

Demetrus Smith said in his affidavit that Perrin (the state's key eyewitness at trial) was his father and that—after Smith had been incarcerated—Perrin told him that he had "testified as a star witness for the prosecution in 1994 in a murder case where he knew he didn't have the right guy, but the police detectives in charge of the case kept telling him he did." Smith said he had met McCray in prison by "pure happenstance," which prompted him to come forward with this information.

Based on these two affidavits, McCray requested a new evidentiary hearing, which the district court granted. At McCray's request, however, the court canceled the hearing (McCray apparently had trouble locating his witnesses) and denied McCray's motion for reconsideration without prejudice.

In August 2016, McCray renewed his Rule 60(b) motion and his request for an evidentiary hearing. In support, he submitted three more affidavits. One was from his cousin, Marcus McCray, who said that he too had witnessed the murder on Bessemore Street. Specifically, he said he had seen "Fat Cat"—whose name was Anthony Jones—near the Suburban when the shooting began,

and that, afterward, Jones got into Dartrell's blue car. Marcus also said he had not seen McCray on the day of the shooting.

A second affidavit was from Antanetta Bradford, who said that, on the day of the shooting, she had heard "several loud bangs" while walking to the grocery store. She had then "looked in the direction of the noise" and saw a "man of medium height and build with a silver gun" walk away from Leonard's vehicle and get into the "passenger side of a blue car." She added that McCray was not the shooter, and that she did not recognize the shooter or the driver of the blue car.

The third affidavit came (again) from Dartrell, who now said that Jones had gotten into his car after Leonard's murder: "I know without a doubt it was Anthony Jones, not Oyd 'Bug' that left the scene with me." He added that he never got "a good look" at the shooter and that, at trial, he had testified that McCray was the gunman due to "fear and coercion."

The district court thereafter ordered another evidentiary hearing, which it held in June 2017, and during which Bradford, Dante, and Character testified. Bradford testified that the shooting "felt like yesterday," but now said she had seen the shooting before she heard it. (In her affidavit the sequence was reversed.) She also testified that the shooter was around 5'5" tall and "a little chunky, stocky like." (In her affidavit she said that he was "of medium height and build.") She also testified that McCray was not the shooter, identified a picture of Jones as the gunman, and said she had not come forward with that information sooner because she was "scared."

Dante testified at the hearing that he had been in the police lineup alongside McCray, and heard Perrin say, "I'm really not sure if that's him." Dante added that "basically someone else [was] telling him, that's him." Dante also said that, when police released him after the lineup,

Perrin had approached him outside the police station, saying that he had picked someone out of the lineup but that he did not "think that is the guy who done it."

That left the testimony of Character, who now said that he had been walking through a field near Bessemore Street on the day of the murder, and that he had seen a man named "Fat Cat" shoot Leonard and then get into a blue car. Character identified a picture of Jones as the man he knew as Fat Cat. On cross-examination, Character freely admitted that he had lied ("false statement") both when he said in his affidavit that he had been on Bessemore Street all day on the day of the shooting, and when he said he had learned about McCray's conviction by "reading cases." Character also could not remember describing the shooter as "Ant" in his affidavit, saying he knew him only as "Fat Cat."

McCray also submitted some new documentary evidence at the hearing, including the police department's homicide file from Leonard's murder, Dante's statement to the police, and Anthony Jones's criminal history and booking photo. McCray also filed, for the first time, the transcript from the preliminary examination that the trial court had held a few weeks after Leonard's murder, at which Jones and Perrin testified.

In August 2018, the district court entered an order denying McCray's motion for reconsideration, finding again that McCray had not met the Supreme Court's standard from *Schlup*. This appeal followed, though our court held it in abeyance for nearly five years pending review by Wayne County's Conviction Integrity Unit. That unit has completed its review, and the case is now before us.

## II.

We review the district court's order denying McCray's Rule 60(b) motion for an abuse of discretion. *Gillispie v. Warden, London Corr. Inst.*, 771 F.3d 323, 327 (6th Cir. 2014).

18

A.

The "actual-innocence" standard that McCray must satisfy here is among the most demanding in federal law. McCray wants the district court to adjudicate his underlying habeas petition, which everyone agrees is untimely. And a district court may consider an untimely habeas petition only if the petitioner shows that, "more likely than not, in light of the new evidence, *no reasonable juror* would find him guilty beyond a reasonable doubt[.]" *House v. Bell*, 547 U.S. 518, 538 (2006) (emphasis added); *see also Schlup*, 513 U.S. at 321, 327. When making that determination, the court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House*, 547 U.S. at 538 (cleaned up); *Keith v. Hill*, 78 F.4th 307, 315 (6th Cir. 2023).

1.

a.

We begin with the state's key eyewitness, Perrin, who undisputedly was a disinterested observer who witnessed Leonard's murder from a mere car's length away. Perrin described the shooter as a black male with dark skin, between 5'3" and 5'7", and weighing from 145 to 150 pounds—a description closely resembling McCray, a black male who had a dark complexion and was 5'6" and weighed 165 pounds at the time of the murder. Perrin identified McCray in a lineup and has since testified repeatedly and unequivocally that McCray was the man he saw kill Leonard.

The question in this appeal is whether—notwithstanding Perrin's disinterested eyewitness testimony—"no reasonable juror" could find McCray guilty beyond a reasonable doubt in light of the new evidence he has presented here. *House*, 547 U.S. at 538.

b.

As an initial matter, we see no reason to revisit our conclusions as to the seven witnesses whose testimony we considered in McCray's last appeal. *See McCray*, 499 F.3d 573-74. We reiterate our determination that, for a variety of reasons, none of those witnesses' accounts are "reliable evidence" that would compel every reasonable juror to acquit McCray—even when considered together with the evidence McCray presents here. *House*, 547 at 537; *McCray*, 499 F.3d at 573-74.

c.

In this appeal, we consider the testimony of McCray's five new witnesses, in addition to yet another account of the murder from Dartrell. Three of these witnesses come to us only by way of affidavit. Dartrell is one of them, and offered his third version of the events on Bessemore Street that day. To reiterate somewhat, Dartrell originally told police in a statement and testified at trial that McCray was the killer. He later recanted that testimony in two affidavits and at an evidentiary hearing. In the affidavit before us now, Dartrell said that Jones got into Dartrell's car after Leonard's murder and left the scene with Dartrell—none of which Dartrell had said in a prior affidavit or in his testimony at trial or during the first evidentiary hearing. He also said that he did not get a "good look" at the shooter, and that he testified at trial that McCray was the killer because the police had threatened him. But a reasonable juror could easily view Dartrell's latest affidavit with "extreme suspicion" and discount it. *McCray*, 499 F.3d at 574 (cleaned up).

A second affidavit comes from Marcus McCray—who is now the fifth member of McCray's family (not including McCray himself) who claims to have been present on Bessemore Street for the shooting that day—and who like all the others did not come forward with his testimony exculpating McCray until years afterward. Marcus, for his part, says he saw Jones near

Leonard's Suburban when the shooting began and then saw Jones get into Dartrell's car. He also says that McCray was not on Bessemore Street when Leonard was killed. Suffice it to say that a reasonable juror could find Perrin's testimony more credible than that of McCray's family members.

The remaining affidavit came from Demetrus Smith, who said his father, Perrin, visited him when Smith was in prison in 1996. Smith said Perrin expressed doubts about his testimony identifying a killer in a 1994 murder trial. Smith also said that—13 years later and by "pure happenstance"—he found himself incarcerated with McCray, and only then realized that McCray was the man against whom his father had testified. His affidavit thus amounts to hearsay long after the fact, from a fellow inmate; and we see no reason why every reasonable juror would find his affidavit convincing.

McCray's three other witnesses—Dante, Bradford, and Character—each submitted an affidavit and testified at an evidentiary hearing. Dante said that he was in the police lineup with McCray, that Perrin said he was not sure that McCray was the killer, and that an officer assured Perrin that McCray was. Dante further testified that, after the lineup, Perrin approached him outside the building and said he was unsure whether he had correctly identified the gunman. Nothing in the record suggests, however, that Perrin knew or otherwise had any reason to confide in Dante. And Dante's only explanation for waiting 14 years to come forward with this testimony—namely, that he did not realize how "important" it was—could likewise leave many if not most reasonable jurors skeptical of his account.

Bradford said in her affidavit that she had witnessed the shooting's aftermath, rather than the shooting itself. Specifically, she said that—after Leonard's Suburban finally rolled into a nearby house—she saw a man of "medium height and build" walk away from Leonard's vehicle

21

and get into a blue car. That description resembled McCray, who was 5'6" and 165 pounds at the time of the murder. When Bradford testified at the evidentiary hearing, however, she claimed to have witnessed the shooting itself. She also changed her description of the purported shooter, saying he was around 5'5" and "chunky." But Bradford testified more than a decade after the shooting, rather than (as Perrin had) a short time afterward; and the district court itself noted that Bradford's memory appeared shaky.

That leaves Character, who said in his affidavit that he had been on Bessemore Street all day "hustling and shooting dice" when he purportedly witnessed the shooting. Yet during the hearing he said that he had been walking through a field near Bessemore when he saw "Fat Cat" (whom he identified as Jones) shoot Leonard and then get into a blue car. Moreover, as noted above, Character freely admitted on cross-examination that he had lied both when he said in his affidavit that he had been on Bessemore Street all day on the day of the shooting, and when he said he had learned about McCray's conviction by "reading cases." And Character also could not remember describing the shooter as "Ant" in his affidavit, saying he knew him only as "Fat Cat." His testimony was patently not credible.

Most of what we said in McCray's last appeal therefore remains true here: that most of McCray's new evidence "consists of testimony (or affidavits) from people who did not witness the shooting and a recantation from an eyewitness [Dartrell] with a motive for dissembling"; that Perrin "had no reason to lie about the murder" and "had a bird's-eye view of the shooting"; and that the "quantity" of McCray's evidence "is not matched by its quality." *McCray*, 499 F.3d at 573, 575. And McCray's more recent effort to pin the murder on Jones—who was 5'8" and 265 pounds at the time of the shooting—founders on Perrin's consistent and contemporaneous testimony that the shooter was around 5'5" and weighed a hundred pounds less than that.

22

2.

Yet McCray says the district court abused its discretion by disregarding the evidence we considered in McCray's prior appeal and by considering each of McCray's new pieces of evidence in isolation. But the record shows that the district court did not consider McCray's evidence merely in isolation. And more to the point, his evidence fares no better collectively than individually. McCray's use of the homicide file is representative. McCray apparently introduced that file to bolster Dartrell's recantations and to suggest that "false leads" had led to McCray's arrest. But that file also contains a statement from Leonard's girlfriend, Parrish, who told police that McCray sold drugs for Leonard and owed Leonard money. Dartrell's initial statement to police—in which he said he also had heard McCray owed Leonard money—corroborated those observations. That file also contains Jones's statement to police, in which he said that, just before the shooting, he overheard Leonard tell McCray that "if I don't get the title to the BMW signed over to me by the end of the day I will kill you." (The record also corroborates that statement—Parrish told police that McCray had a yellow BMW.)

McCray has not remotely met the Supreme Court's actual-innocence standard in *House*. The district court therefore did not abuse its discretion when it denied McCray's Rule 60(b) motion.

\*        \*        \*

The district court's August 17, 2018 order is affirmed.

**KAREN NELSON MOORE, Circuit Judge, dissenting.** Oyd McCray was convicted of first-degree murder after a two-day trial in Michigan state court. No physical evidence connected McCray to the murder. And of the state's two witnesses that placed McCray as the murderer, one has since fully recanted and now points to another man as the killer. The majority agrees that a life-without-parole sentence now rests on a single-eyewitness account. That eyewitness's identification was shaky from the start. Since trial, McCray has marshaled substantial new evidence that shows that he is likely innocent. In fact, it shows who likely did kill Perry Leonard: Anthony Jones. The vast majority of this new evidence is consistent, corroborative, and credible. Under the weight of this evidence, the slender reed on which the state rested its case buckles. But the majority proceeds by *ipse dixit*, declaring that certain evidence should not count because it says it should not count. It proceeds in piecemeal fashion, finding inconsequential issues, blinding itself to the consistent threads showing McCray's innocence. This approach is inconsistent with the record and the law. At this juncture, all that McCray asks for is a day in federal court so that the district court may consider his habeas petition on the merits. Because the majority is wrong to deny McCray that narrow relief, I respectfully dissent.

From the outset, the majority misunderstands its task. It declares that the "standard McCray must satisfy here is among the most demanding in federal law." Maj. Op. at 19. Though demanding, the genesis of the gateway standard, *Schlup v. Delo*, is not impossible to meet, as the majority appears to think. 513 U.S. 298, 316 (1995) (explaining that "evidence of innocence" for a gateway claim "need carry less of a burden" than other types of claims because the "claim of innocence [is paired] with an assertion of constitutional error"). Consistent with that guidance, this court and the Supreme Court have recognized that a petitioner can successfully meet their burden by showing less than "conclusive exoneration," *House v. Bell*, 547 U.S. 518, 553 (2006),

24

including by "dismantl[ing] the government's case against" them, *Keith v. Hill*, 78 F.4th 307, 315 (6th Cir. 2023) (Kethledge, J.), *cert. denied sub nom. Keith v. May* (2024). Whether through building an affirmative case or by attacking the evidence that supported a petitioner's guilt, all that is required is that a petitioner show that it is more likely than not that no reasonable juror would convict. *See, e.g.*, *House*, 547 U.S. at 541 ("When the only direct evidence of sexual assault drops out of the case, so, too, does a central theme in the State's narrative linking [the petitioner] to the crime."); *Souter v. Jones*, 395 F.3d 577, 590 (6th Cir. 2005) ("[Petitioner] has presented new evidence collected over the past several years that does raise *sufficient doubt* about his guilt and that *undermines confidence in the result of his trial*." (emphases added)); *id.* at 592 ("We conclude that this new evidence . . . when taken together chips away at the rather slim circumstantial evidence upon which [the petitioner] was convicted." (internal quotation marks omitted and alterations adopted)); *Cleveland v. Bradshaw*, 693 F.3d 626, 641–42 (6th Cir. 2012) (petitioner satisfied *Schlup* in part by presenting recantation of witness whose testimony was "the only evidence linking [the petitioner] to [the] murder"); *McCray v. Vasbinder* ("*McCray I*"), 499 F.3d 568, 575 (6th Cir. 2007) (recognizing that "contradict[ing] the testimony of an eyewitness" would be a key part of showing actual innocence). When a petitioner does this, they show that it is "more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

At other times, the majority properly *recites* the law, but its analysis belies the very law it invokes. We must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." Maj. Op. at 19 (quoting *House*, 547 U.S. at 538). The majority's piecemeal assessment of the evidence, however, entirely contradicts this command. Rather than consider the consistent narrative presented, the majority looks at each piece of evidence in isolation, identifying small

25

inconsistencies and effectively holding each piece up against Perrin's trial testimony. At times, it goes so far as to suggest that certain evidence could not be admitted at trial, directly contrary to what we must consider at this juncture according to *House*. *See* Maj. Op. at 21. In so doing, the majority loses the forest for the trees.

What is more, the majority comes up with unfounded *per se* rules for throwing out compelling evidence without considering it at all, and certainly not in combination with other evidence. Although this court previously held that certain evidence presented by McCray did not make a showing of actual innocence *at that time*, *McCray I*, 499 F.3d at 573–74, McCray has presented substantial new evidence that *corroborates* that old evidence and makes it all the more compelling today. Simply disregarding this evidence is at odds with the totality-of-the-circumstances approach we must take. Peppered throughout the majority opinion are indications that evidence that comes from fellow inmates, or family members, or from witnesses that saw the immediate aftermath of the shooting but not the shooting directly simply counts for nothing. *See* Maj. Op. at 21, 22. Although those may be reasons further to scrutinize evidence, the majority's conclusory decisions to declare evidence incredible betrays the proper inquiry.

Properly framed, McCray has proven his actual innocence both by entirely dismantling the state's weak case and by affirmatively showing that he was not the shooter. First, a combination of the evidence directly contradicts the lone standing eyewitness's account. *McCray I*, 499 F.3d at 574. From the beginning, Perrin's identification has rested on an uncertain foundation. Perrin had admitted issues identifying McCray in the lineup, because McCray had facial hair whereas Perrin recalled that the shooter did not. Moreover, evidence that the panel considered in *McCray I* suggested that Perrin was mistaken, given competing versions of the immediate aftermath of the shooting. *See, e.g.*, R. 14 (Stacy McCray Aff. at 1) (Page ID #47) (Anthony Jones was at the side

26

of Leonard's vehicle, fled the scene in Dartrell Effinger's car, and McCray was not on Bessemore Street); R. 14 (Ross Aff. at 1) (Page ID #48) (McCray was not the one running from the Suburban); R. 14 (Rice Aff. at 1–2) (Page ID #50–51) (Jones fled the scene in Dartrell Effinger's car and McCray was not on Bessemore); R. 14 (Gilbert Aff. at 1) (Page ID #51) (similar); R. 106-1 (Hearing Tr. at 61:4–63:9) (Page ID #1365–67) (explaining that McCray was at Bacon's home watching children when shooting occurred).

Additional new information not considered by this court in *McCray I* now suggests that Perrin's eyewitness identification, essentially the state's entire case, should be discounted. The preliminary-examination transcript further demonstrates that Perrin was unsure of his identification of McCray. R. 96-5 (Preliminary Examination at 35:10–22) (Page ID #1120) (Perrin stated that the shooter "could be No. 3" and did not recall the shooter having facial hair). The homicide file likewise undermines confidence in Perrin's account; at the lineup, Perrin stated only that McCray "looks like [the shooter]" and that McCray again had no mustache during the shooting. R. 96-1 (Homicide File at 84–85) (Page ID #937–38). Now, two affiants have come forward with further statements from Perrin showing that Perrin's initial identification could not have supported a conviction. First, Demetrus Smith, *Eric Perrin's son*, explained that Perrin admitted to misidentifying McCray at the lineup while under pressure from the police. R. 78-4 (Smith Aff. at 1) (Page ID #466). Presumably, Smith would have an incentive not to state that his father was critically incorrect. *Cf. McCray I*, 499 F.3d at 572–74 (explaining that a court should be cautious in crediting family-member testimony due to their personal stake in a matter). Second, Dante Effinger averred in a manner entirely consistent with the homicide file and Perrin's preliminary-examination testimony that Perrin said that "number three could be the shooter but I

27

am not sure," and that Perrin admitted that he was unsure about his identification after the lineup. R. 78-3 (Dante Effinger Aff. at 1) (Page ID #465).

A combination of the evidence goes further, by both contradicting Perrin's account *and* by showing that Anthony Jones was the likely shooter. For one, Perrin's own trial testimony in combination with the homicide file and preliminary-examination testimony shows that Anthony Jones, not McCray, likely shot Leonard. A key detail from Perrin's trial testimony was that after McCray finished shooting Leonard, McCray walked to Dartrell Effinger's blue Malibu and left the scene with Effinger. R. 19 (Trial Tr. at 62:24–64:24) (Page ID #529–31). No one else was in the vehicle according to Perrin. *Id.* Anthony Jones testified at the preliminary examination, however, that *he* left the scene in Effinger's car after the shooting, and that McCray was not even on Bessemore Street. R. 96-5 (Preliminary Examination at 8:13–15, 14:5–15) (Page ID #1094, 1100). Jones's preliminary-examination testimony is consistent with both Jones's own statement to the police, R. 96-1 (Homicide File at 167) (Page ID #1020) (explaining that Jones ran back to Effinger's car after the shooting), and Dartrell Effinger's statement to the police, *id.* at 162 (Page ID #1015) (stating that Effinger and Jones left the scene after the shooting in Effinger's car and that McCray ran off into a vacant lot).

The state entirely fails to address this critical point concerning Perrin's claim that the person who got into Effinger's car was the shooter. So, too, does the majority. Perrin's trial testimony and Jones's and Effinger's preliminary-examination testimony and statements to the police cannot coexist. Either Perrin witnessed the shooter enter Dartrell Effinger's car and leave with him, making the shooter Jones, or the shooter did not leave the scene with Dartrell Effinger, seriously undermining Perrin's identification. Jones's statement that he got into Effinger's car after

28

the shooting in combination with Perrin's trial testimony is plainly a statement against Jones's interest: it suggests that Jones was the shooter, not McCray.

Witness affidavits and testimony—both those presented to the district court before *McCray I* and those that post-date the decision—bolster the conclusion that Jones, rather than McCray, shot Leonard. Some of that evidence includes witness statements that the prior panel held were not sufficient, *standing alone*, to satisfy the requirements of an actual-innocence gateway claim, either due to the fact that the evidence came from McCray's family or because the affiant did not directly witness the shooting. In other words, despite the holding in *McCray I* that the evidence presented at that time did not clear *Schlup*'s hurdles, McCray is not starting from square one. Rather, he has already presented substantial evidence that (1) he was not at the scene of the crime in the immediate aftermath of the shooting; (2) Anthony Jones was; and (3) Jones left with Dartrell Effinger. Because it is the totality of the evidence that matters, prior evidence that has now been corroborated deserves weight today.

The new witness affidavits and testimony play this corroborating role. With this corroboration, evidence this court once held insufficient standing alone is seen in a new light. Marcus McCray submitted an affidavit stating that he directly witnessed the shooting and that it was done by "Fat Cat," whose real name is Tony. R. 88-2 (Marcus McCray Aff. at 1) (Page ID #787). Marcus McCray's affidavit is consistent with the details presented in other evidence, including that Jones left the scene in the blue Malibu with "Trell." *Id.* And Bradford's affidavit and testimony reiterate the same. She directly witnessed the shooting, saw the shooter get into a car after the shooting, and explained that the shooter was not McCray. R. 88-3 (Bradford Aff. at 1) (Page ID #790). Although Bradford had some difficulty remembering certain specific details during her testimony, she clearly identified Anthony Jones as the shooter. R. 97 (2017 Hearing Tr.

29

at 12:23–13:1) (Page ID #1147–47). Again, Bradford did not offer her statements in a vacuum; the thrust of her recollection is entirely consistent with the other evidence. In all, nearly every witness statement and piece of documentary evidence tells a consistent story about who was at the scene (Jones), who was not (McCray), and who left with Dartrell Effinger (Jones).

Finally, a combination of the evidence supports Dartrell Effinger's recantation and lends credibility to it. Dartrell Effinger submitted another affidavit after *McCray I*, explaining that Anthony Jones left the crime scene with him, that he could not identify who was standing near Leonard's vehicle, and that he had testified that it was McCray who shot into Leonard's vehicle only due to police-created "fear and coercion." R. 88-4 (Dartrell Effinger 2010 Aff. at 1) (Page ID #793). Dartrell Effinger's new statements are consistent with his prior affidavit. *See* R. 14 (Effinger Aff. at 1) (Page ID #53) (stating that Effinger could not identify who was standing near the Suburban and that the police threatened Effinger with potential charges); R. 106-1 (Hearing Tr. at 19:13–20:1, 22:1–6) (Page ID #1323–24, 1326) (same). But so too are his affidavits corroborated by each and every other witness that McCray presented that explained either that (1) McCray was not at the scene; (2) Jones was the one standing by Leonard's car immediately prior to the shooting; (3) Jones was the one who entered Dartrell Effinger's blue Malibu after the shooting; or (4) Jones was the shooter.

Moreover, Dartrell Effinger's recantation is consistent with Jones's testimony at the preliminary-examination hearing that Jones was forced by the police to make certain statements about the shooting, as well as evidence that the police may have leveraged Jones's and Dartrell Effinger's criminal exposure against them. *See* R. 96-5 (Preliminary Examination at 11:10–12) (Page ID #1097) (testimony pertaining to police forcing Jones to make statement); R. 96-1 (Homicide File at 25) (Page ID #878) (notice of parole violation for Jones following his recanting

statements at the preliminary examination). And as with Jones's statements, Dartrell Effinger's recantation tends plausibly to inculpate him as an accomplice to Jones's crime, further suggesting that it is credible. *See, e.g.*, *Cleveland*, 693 F.3d at 640 ("In sum, the fact that [the recanting witness] had no motive to recant his testimony but instead sought to do so on his own free will, and has not subsequently withdrawn that testimony, lends it credibility.").

No doubt, individual pieces of the evidence have their issues. But those issues merely show that, standing alone, any one piece of evidence would fail to meet the *Schlup* standard. McCray, however, has presented sufficient evidence that, *on the whole*, would lead no rational juror to convict him beyond a reasonable doubt. Like the state in this case, the majority has failed to point out inconsistencies *across* affidavits and documents presented by McCray. The issues that the majority identifies simply call for further scrutiny of certain witness statements. With respect to Bradford, obviously certain details were not crystal clear. These minor details, however, hardly go to McCray's guilt, particularly in light of Bradford's insistence that she directly witnessed the shooting and her positive identification of Jones as the shooter. Contrary to the majority's view, Bradford gave a description of the shooter prior to identifying Jones that is consistent with Jones's appearance: "chunky" and "stocky." R. 97 (2017 Hearing Tr. at 12:9–14) (Page ID #1146). Bradford stated that the shooter may have been 150 or 160 pounds only after prompting from the state and after explicitly explaining that she had difficulty estimating body weights. Given the overall consistency of Bradford's statements with the other evidence, such insignificant inconsistencies do little to undermine her statements.

The same is true for Demetrus Smith and Dante Effinger. As with statements from Dartrell Effinger and Anthony Jones, the statements from Smith and Dante Effinger are not self-interested and potentially inculpate family members. For example, Dante Effinger's statements concerning

31

Perrin's issues identifying the shooter increase Dante Effinger's own criminal exposure and that of his brother, because both Effinger brothers appeared to be suspects at one point. Likewise, Smith's statements concern his *father*'s misidentification of the shooter. Presumably, Smith would have little incentive to disparage his father unless the information was important. Although the majority is correct that it took both witnesses time to come forward, the statements are consistent with the wealth of the evidence produced to date. And a reasonable explanation exists for why Dante Effinger sat on the information: he was a suspect in the murder.

Successfully meeting *Schlup*'s standard does not entitle a petitioner to any affirmative relief: it just allows a petitioner to have their day in federal court. To date, thirteen witnesses have filed sworn statements or testified either that McCray was not at the scene of the shooting or that Anthony Jones actually shot Leonard. Several of these witnesses are either disinterested or have testified in a manner that goes against their own self-interest. Substantial other evidence, including the homicide file itself, corroborates those statements. The only non-recanting eyewitness to the shooting, Eric Perrin, testified that the shooter left in the blue Chevrolet Malibu. Either Perrin is to be believed, in which case he misidentified McCray when he saw Jones, or his testimony as the only non-recanting witness is not credible, eviscerating the state's thin case. The majority declines to grapple with, let alone address, this core issue. Confronted with the wealth of evidence undermining Perrin and affirmatively exculpating McCray, any reasonable juror would have a reasonable doubt about McCray's guilt. At this stage, that is sufficient for McCray to continue litigating this case. McCray has satisfied the *Schlup* standard and should be allowed to proceed with his habeas petition. For those reasons, I respectfully dissent.